647 S.E.2d 798

STATE of West Virginia, ex rel. Carroll
Eugene HUMPHRIES, Petitioner
Below, Appellant

v.

Thomas McBRIDE, Warden Respondent
Below, Appellee.

No. 33103.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 24, 2007.

Decided April 19, 2007.

Concurring Opinion of Justice
Starcher June 28, 2007.

William C. Forbes, Forbes Law Offices, PLLC, Charleston, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Assistant Attorney General, Charleston, for Appellee.

PER CURIAM:

This case is before the Court on appeal from an October 7, 2005, Order of the Circuit Court of Greenbrier County, which denied Appellant's petition for writ of habeas corpus. This Court has before it the petition for appeal, the briefs of the parties, and all matters of record. Following a review of the record herein,[1] this Court finds that the circuit court erred in denying the petition for writ of habeas corpus. Accordingly, this Court reverses the October 7, 2005, Order of the circuit court and remands the matter for retrial of the criminal charges contained in 98–F–54 and 99–F–36.

## I.

### FACTS

On February 5, 1976, Billy Ray Abshire was killed when a bomb contained in a cardboard box and found on the left front fender of his car detonated as he left his home for work. The Bureau of Alcohol, Tobacco, and Firearms (the "ATF") investigated the incident and concluded that the bomb was of Abshire's making. All other suspects had been eliminated by the ATF, either by polygraph or by other means; and Abshire had access to the explosive used in the bomb. Furthermore, Kin–E–Pak explosive, an electric blasting cap, and an anti-disturbance device like those used in the bomb were found inside Abshire's trailer. The ATF concluded that Abshire had likely made the bomb and accidentally detonated it himself. Accordingly, his death was ruled accidental, and the investigation went no further.

At the time of Abshire's death, Appellant Humphries was engaged in a relationship with Abshire's estranged wife, Kitty. Humphries claims that during that period of time, he was attempting to help Kitty obtain a divorce from her husband, who had been holding out in an attempt to preserve the family. To that end, he consulted with an acquaintance, Gene Gaylor, who Humphries alleges he paid $2000 to research how Kitty could obtain a "quickie" Las Vegas divorce. In the meantime, Abshire consulted with an attorney by the name of John Detch regarding a divorce from Kitty.[2] Abshire's divorce complaint was filed by John Detch the day before Abshire died.

In 1998, some 22½ years after Abshire's death, Humphries became the focus of a criminal investigation into the death. Gene Gaylor and his brother, Clayton, implicated Humphries in a murder plot, whereby Humphries allegedly paid Gene to make a bomb to kill Abshire. These accusations came to light after Humphries successfully prosecuted the Gaylors in federal court for an extortion plot which, curiously or not, involved Abshire's death. Together with Kitty Abshire, Gene Gaylor, and Robert Brown, Humphries was indicted in Greenbrier County in connection with the murder of Billy Ray Abshire.[3]

The case was moved to Putnam County on Humphries' motion,[4] where, on July 30, 1999, Humphries was convicted as an accessory before the fact to murder in the first degree and conspiracy to commit murder. He was sentenced to life (with mercy) on the accessory charge and one to five years on the conspiracy charge. The sentences were set to run consecutively. Humphries' direct appeal of his conviction was refused by this Court on October 3, 2000.

On March 28, 2001, Humphries filed a *pro se* petition for writ of habeas corpus in the Circuit Court of Greenbrier County, which

---

1. No oral argument was made on this case. Rather, the case was submitted on briefs.

2. Humphries would later be represented at his criminal trial by John Detch's son, Paul, which goes to the very heart of this appeal.

3. In felony indictment 98–F–54, Humphries was indicted on one count as an accessory before the

fact to murder, on one count of conspiracy to commit murder, and on one count of conspiracy to inflict injury. The third count—conspiracy to inflict injury—was dismissed upon the State's motion on March 16, 1999.

4. When the case was moved to Putnam County on July 1, 1999, it was assigned case number 99–F–36.

was summarily denied. Humphries then re-tained his current attorney and filed an amended petition for writ of habeas corpus. An omnibus hearing was then held by the circuit court during which several issues were raised. The court again denied the petition, and Humphries now appeals.

## II.

## STANDARD OF REVIEW

■ This Court has recently clarified that "[i]n reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong stan-dard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factu-al findings under a clearly erroneous stan-dard; and questions of law are subject to a de novo review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006). With that in mind, we proceed to a discussion of the present appeal.

## III.

## DISCUSSION

■ Six issues were presented to this Court on appeal.[5] Of those, the State con-ceded error to three issues. They are Hum-phries' contention that he suffered ineffective assistance of counsel at his criminal trial, that his Fifth Amendment rights were violat-ed in the course of his criminal trial, and that his Sixth Amendment rights were violated in the course of his criminal trial.[6] However, "[t]his Court is not obligated to accept the State's confession of error in a criminal case. We will do so when, after a proper analysis, we believe error occurred." Syl. Pt. 8, *State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). For that reason, while we need not delve into them in excessive detail, we will address each of the assignments of error in turn.

**5.** The six issues presented were: Ineffective as-sistance of counsel, pre-indictment delay, failure to disclose exculpatory evidence, violation of Humphries' Fifth Amendment rights, violation of double jeopardy, and violation of Humphries' Sixth Amendment rights.

## A. Ineffective Assistance of Counsel

■ The Sixth Amendment of the Unit-ed States Constitution and Article III, Sec-tion 14 of the West Virginia Constitution both guarantee to the criminally accused the right to counsel. In *State ex rel. Favors v. Tucker*, 143 W.Va. 130, 140, 100 S.E.2d 411, 416 (1957), we recognized that "this right has been held to mean *effective* assistance [of counsel]...." (Emphasis added.) It is not uncommon for one who has been convicted to challenge whether he or she has received that guaranteed effective assistance of coun-sel; and in its extensive review of such claims, this Court has held that "[i]n the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strick-land v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for coun-sel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). We went on to clarify that "[i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circum-stances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or sec-ond-guessing of trial counsel's strategic deci-sions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syl. Pt. 6, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Guided by that principle and mindful of its admonition not to second-guess trial counsel, we look at the particular errors alleged to have been made by trial counsel.

**6.** The Court was also curious as to Humphries' contention that exculpatory evidence was with-held from the defense. However, Humphries' argument on this point is rather vague, and there is nothing in the record such as would allow the Court to fairly evaluate the merits of this argu-ment. We find no merit in the remaining two issues.

On appeal, Humphries alleges that trial counsel, Paul Detch, was ineffective for six reasons: He had a conflict of interest which made him a necessary witness in the criminal trial, he allowed Humphries' Fifth Amendment rights to be violated, he failed to impeach FBI Agent Baxter or to introduce Baxter's reports which would have corroborated the defense's theory of the case, he failed to investigate or hire an expert, he allowed the introduction of evidence as to the convictions of Humphries' co-defendants, and he allowed Humphries' Sixth Amendment rights to be violated. Humphries alleges that the cumulative effect of all these errors was "so egregious as to be beyond any realm of objectively reasonable conduct of a criminal defense attorney." We should note that in his petition below, Humphries asserted that he suffered ineffective assistance of counsel only under the theories that Detch allowed the introduction of evidence as to the convictions of Humphries' co-defendants and that he allowed Humphries' Sixth Amendment rights to be violated.[7] However, in the omnibus hearing, he did argue and elicit testimony on each of the errors asserted on appeal here.

In *State ex rel. Wine v. Bordenkircher*, 160 W.Va. 27, 230 S.E.2d 747 (1976), the Court observed:

This is an appeal from the denial of relief on a petition for habeas corpus. A petitioner who seeks relief in habeas corpus in a trial court on one ground and appeals to this Court upon the denial thereof cannot, on appeal, obtain such relief on a different ground. Otherwise, the appeal would serve the office of an original petition in habeas corpus.

*Id.* at 33, 230 S.E.2d at 751. However, we are of the mind that such is not really the case here. While it is true that, on appeal, Humphries seems to have expanded on his argument of ineffective assistance of counsel, he has not actually raised a "different ground" for relief as contemplated by *Bordenkircher*. And the evidence before this Court is the same evidence that was before the court below, so we are not now considering new evidence which would tend to invoke our original jurisdiction. Accordingly, we have considered each of the assertions of ineffective assistance of counsel presented by Humphries in this appeal.

■ Humphries' first argument is that trial counsel had a conflict of interest such as would preclude Humphries from receiving a fair trial; therefore, Detch should have either removed himself as trial counsel or should have been removed by the trial court. The State agrees. The basis for this contention is the fact that Detch's father, John, had represented the victim in his divorce from his wife, who later became the wife of Humphries. That divorce goes to the very heart of the alleged motive in the underlying criminal trial.[8]

The matter of the conflict was actually raised by the State prior to trial. The State objected to Detch representing Humphries and asked Detch to step aside. Detch declined to step aside and assured the State that not only had he not worked on the divorce case, but that Humphries had duly waived any objection to any conflict of interest. The State then asked the trial court to disqualify Detch. The trial court found that while Detch's representation of Humphries was a "technical violation" of Rules 1.9 and 1.10 of the West Virginia Rules of Professional Responsibility,[9] Detch had assured the

7. The other issues raised in the petition for writ of habeas corpus were pre-indictment delay, violation of Humphries Sixth Amendment rights (outside of the context of ineffective assistance of counsel), and failure to dismiss upon the issue of double jeopardy.

8. The theory of the State's case was that Humphries had hired Gene Gaylor to murder Abshire because he would not grant Kitty a divorce. The State theorized that though Humphries claimed to have paid Gaylor to research how Kitty could obtain a Las Vegas divorce, the term "Las Vegas divorce" was actually slang for a contract killing.

9. Rule 1.9 of the West Virginia Rules of Professional Conduct states as follows:

Conflict of interest: Former client.
A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or

court that he had no information about the divorce case. Accordingly, the court denied the State's motion. However, Humphries and the State further contend that Rule 3.7 of the Rules of Professional Conduct, addressing "Lawyer as witness," is at issue as well.[10]

Rule 3.7 is of particular interest because, during the omnibus hearing, Detch testified that he may well have been the "last attorney to see Mr. Abshire alive." He explained that his father was representing Abshire in his divorce proceedings and that he had reasons why he believed that Abshire had blown himself up. Detch testified further that he "knew that, that ah—there was the whole discussion that time about the Las Vegas divorce ah—which even at that time, was discussed, in nineteen seventy-six (1976)." That led to the following exchange:

Q: And by "Las Vegas divorce," what are you referring to?

A: When I came to practice with my father, ah—he represented Billy Ray Abshire and, at that time period, he asked me to resource [sic] the aspects of a Las Vegas divorce and I had to go over it and spend time dealing with that. I come [sic] out of law school and do something about from the domestic relations and I researched that, at that time. That was a hot issue during the Abshire

divorce. Now, how it factored in at that time, I didn't know -

Q: Explain what you mean by the "Las Vegas divorce."

A: There was a discussion that Kitty ah—Kitty Abshire was going to go to Las Vegas and obtain a divorce so she could deprive Mr. Abshire of his children and she was making plans to go out there, maybe even went out there, for all I knew but it was discussed and ah—she was going to go out there and my father was having me research it as to whether the Las Vegas people ah—would have had the jurisdiction to made [sic] an award of custody and what that would define in terms of property and that was what I had to research in that time period and that's why Mr. Abshire was there in the office the night before he was killed.

Q: And that became an issue during the ah—trial of Mr. Humphries?

A: It was all brought and as far as I know, was not necessary to provide testimony in regards to that. It was brought out by several witnesses dealing with the Las Vegas divorce.

The biggest problem we had was Mr. Burnette saying that a Las Vegas divorce was a threat to kill somebody and

---

require with respect to a client or when the information has become generally known.
Rule 1.10 states:
Imputed disqualification: General rule.
(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.
(c) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless:

(1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
(2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter.
(d) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

**10.** Rule 3.7 states:

Lawyer as witness.
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

as far as I knew that was just a false representation to the court I resented it because that was just Mr. Burnette's fabrication as far as I was concerned.

It would seem, then, that Detch was—or at least could have been—a necessary witness for the defense to refute the State's assertion that the idea of a "Las Vegas divorce" was something less than a legitimate means to an end of a marriage and something more akin to a contract killing.

Furthermore, while Detch contended at the pre-trial hearing that he did not represent Abshire and that he and his father were not really "partners" so much as two attorneys sharing office space, the fact remains that in the divorce complaint filed by John Detch on behalf of Abshire and for which Paul Detch now admits he performed research, Humphries was named as the man with whom Kitty Abshire had fallen in love and for whom she had left her husband. Detch testified at the omnibus hearing that he made Humphries aware of his involvement in the Abshire divorce prior to trial. However, that directly contradicts Detch's pre-trial assertions to the court that he had had *no* involvement with the Abshire divorce case when he worked in his father's law office. Rule 1.7 of the Rules of Professional Conduct is the "general rule" governing conflicts of interest, and it states, in pertinent part:

(b) A lawyer *shall not* represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, *unless:*

(1) the lawyer reasonably believes the representation will not be adversely affected; *and*

(2) *the client consents after consultation.* When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(Emphasis added.) While the record reveals that during the hearing on the State's pretrial motion to disqualify Detch, Detch represented to the court that Humphries specifically waived any conflict of interest, one must question whether that waiver was truly an informed decision following consultation under Rule 1.7 given Detch's conflicting statements about what his involvement was in the Abshire divorce case.

■ Detch was obligated by the Rules of Professional Conduct to step aside and let Humphries find counsel elsewhere. When he didn't, the trial court abused its discretion when it failed to disqualify him. "A circuit court, upon motion of a party, by its inherent power to do what is reasonably necessary for the administration of justice, may disqualify a lawyer from a case because the lawyer's representation in the case presents a conflict of interest where the conflict is such as clearly to call in question the fair or efficient administration of justice. Such motion should be viewed with extreme caution because of the interference with the lawyer-client relationship." Syl. Pt. 1, *Garlow v. Zakaib*, 186 W.Va. 457, 413 S.E.2d 112 (1991). Here, the conflict was clearly at odds with the fair and efficient administration of justice. And while Humphries had the right to retain whatever attorney he chose, he also—and more importantly—had the right to effective representation, free from conflict. See Syl. Pt. 2, *Cole v. White*, 180 W.Va. 393, 376 S.E.2d 599 (1988). As we recognized in *State ex rel. Blake v. Hatcher*, 218 W.Va. 407, 413–414, 624 S.E.2d 844, 850—851 (2005), "Where representation is affected by an actual conflict of interest, the defendant cannot be said to have received effective assistance of counsel as required by the Sixth Amendment."

■ Humphries' next argument is that Detch allowed Humphries' Fifth Amendment rights to be violated. Andrew McQueen, testifying at the omnibus hearing as an expert on effective assistance of counsel and the fairness of the criminal trial, pointed out that in its direct examinations of ATF Agent Jack Beck, the State, in reviewing the list of suspects the ATF investigated in 1976, elicited testimony which made light of the fact that Humphries consulted with his attorney and opted not to speak to investigators at the time of the initial investigation into Abshire's death. Later on, the State elicited testimony

from former Assistant United States Attorney Morgan Scott regarding Humphries' choice to consult with his attorney before answering certain of Scott's questions. Detch did not object either time; although, the State had clearly crossed over into a line of questioning that was violative of Humphries' right to remain silent. McQueen testified that a reasonably competent attorney would have objected.

McQueen also took issue with Detch asking Humphries on direct, "Have you at anytime refused to give a statement to the police in this regard?" While Humphries went on to answer, "No sir, I have not," McQueen testified that Detch's asking of that particular question constituted waiver of his client's rights. Again, McQueen testified that a competent attorney would not find any strategic value in such a question.

Finally, in its closing argument, the State commented, "On August the 16th, 1976, ATF Agent Jack Beck—you heard his testimony— he closed his investigation after exhausting all possible leads. He didn't have anything to go on. He didn't know about Gene Gaylor. Mr. Humphries hadn't told him anything about Gene Gaylor." Despite several other objections sprinkled throughout the State's closing argument, Detch did not object to that particular statement despite the fact that this Court has said:

> " 'Under the Due Process Clause of the West Virginia Constitution, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury.' Syllabus point 1, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977)." Syl. Pt. 1, *State v. Walker*, 207 W.Va. 415, 533 S.E.2d 48 (2000).

It seems clear that Detch's failure to object to the introduction of evidence which would tend to violate Humphries' rights under the Fifth Amendment demonstrates that his representation of Humphries was deficient, satisfying the first prong of the *Miller* test. It is less clear whether the result of the trial would have been different if Detch had been more vigilant of Humphries' Fifth Amendment rights, but we will reserve judgment on the impact of Detch's actions or inactions for now.

■ Humphries' next argument is that he suffered ineffective assistance of counsel when Detch failed to impeach the testimony of FBI Agent George Baxter with a 1977 report which Baxter had prepared following his investigation of Abshire's death. That report contains observations that the device which killed Abshire consisted of Kin–E–Pak explosive, an electric blasting cap, and an anti-disturbance device. According to that same report, each of these components was also found in Abshire's trailer, which would corroborate the defense theory that, in fact, Abshire constructed the bomb himself and accidentally detonated it.

At trial, Baxter testified as to how different types of bombs are constructed and how they operate. While Detch questioned Baxter extensively on cross-examination as to whether the bomb might have accidentally detonated or detonated through some action of Abshire, he did not question Baxter as to whether Abshire could have constructed the bomb. He also failed to introduce Baxter's report into evidence or otherwise question him as to whether the components found inside Abshire's trailer could have been the same components used to construct the bomb.

McQueen testified at the omnibus hearing that a reasonably competent attorney would have either cross-examined Baxter about the contents of his 1977 report or put the document into evidence in order to "argue it like crazy." And given that the thrust of the defense was that Abshire had built the bomb himself and had accidentally detonated it, it is hard to imagine that there was any strategic reason for not introducing the document or questioning Baxter about it. Again, it would certainly seem that the first prong of the *Miller* test has been satisfied here. It also seems that it is probable that the introduction of such information would have led the jury to a different outcome, but, again, we reserve judgment until we have evaluated each assertion of ineffective of counsel.

Humphries next argues that Detch failed to properly investigate this highly complex case. Specifically, Humphries points out that Detch failed to retain an expert to investigate what little bit of evidence remained to determine the structure of the bomb, who might have constructed it, and how it might have been detonated. He also points out that Detch did not employ a private investigator to investigate the State's star witness, Clayton Gaylor.

McQueen testified at the omnibus hearing that a competent attorney would have enlisted both a forensics expert and an investigator to help him or her pick through the timeworn and tedious details of this case. Detch testified that he simply did not have the financial resources to hire an expert and that, traditionally, he and his staff did all of the "leg work" on his cases rather than hiring an investigator. Detch further testified that he fully discussed the proposition with Humphries, but at the end of the day, Humphries did not feel that he could raise the money for an expert.

As we recognized in *State ex rel. Quinones v. Rubenstein*, 218 W.Va. 388, 394, 624 S.E.2d 825, 831 (2005), "With regard to the responsibility of an attorney to investigate, the United States Supreme Court in *Strickland v. Washington* said, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.' 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674." Given the complexities of this case, we agree with McQueen that it was unreasonable for Detch not to hire an expert or independent investigator. While in *Quinones* we were not convinced that the attorney's failure to investigate prejudiced the defendant's case, here we are not convinced that Detch's failure to investigate did *not* prejudice Humphries' case. Again, we find that the first prong of *Miller* has been met.

Humphries also challenges the introduction of co-defendant Robert Brown's conviction, who, along with Gene Gaylor, was tried and convicted before Humphries. In fact, it was during Detch's cross-examination of State Trooper Michael Spradlin that the matter was raised. In discussing the corroboration of a statement made to him, Detch asked Spradlin, "If I understand it correctly, you're only talking about another codefendant." Spradlin answered, "Codefendant Robert Vernon Brown who was convicted." Now, certainly, Detch did not elicit this particular response from Spradlin. However, it was incumbent upon Detch to object, move to strike, ask the court to give a cautionary instruction, and/or move for a mistrial in light of this prejudicial testimony. After all, "[o]ur law is clear that the State may not introduce evidence of a conviction or guilty plea on the part of a co-conspirator or accomplice to prove the guilt of a person subsequently put on trial for committing or participating in the same crime." *State v. Wood*, 167 W.Va. 700, 703, 280 S.E.2d 309, 312 (1981).

Moreover, Humphries had specifically requested that his trial be moved from Greenbrier County *because* of the very publicity generated by the Gaylor and Brown trials. Still, Detch did nothing to attempt to ameliorate the damage, though he was likely to find success. This Court has held that:

> It is a proper exercise of trial court discretion to deny a defendant's motion for mistrial, based on the mention at trial of the fact of an alleged co-conspirator's or accomplice's conviction of or plea of guilty to the same offense for which the defendant is being tried, in circumstances where the trial's continuation will not result in actual prejudice to the defendant. Syl. Pt. 3, *State v. Ellis*, 161 W.Va. 40, 239 S.E.2d 670 (1977).

Yet Detch did not even *make* a motion for mistrial. Though Detch testified later that he expected all along that the State would try to "sneak [the conviction] in," he left the decision as to whether to move for a mistrial to his client. When Humphries tried to defer to Detch's judgment, Detch, according to his own testimony, again left it to his client. In his own words, Detch explained at the omnibus hearing, "Mistrials to me just postpones [sic] something and they double your

cost, so I–I, frankly, don't favor mistrials." We believe that a reasonably competent attorney would have at least objected or moved to strike and would likely have made a motion for mistrial; therefore, the first prong of *Miller* has been established.

Humphries' last contention of ineffective assistance of counsel is that Detch failed to address violations of Humphries' Sixth Amendment rights. Humphries argued that throughout the trial, hearsay testimony was offered through various witnesses who testified as to what people who were not witnesses at the trial had told them, particularly key players Gene Gaylor, Robert Brown, and Kitty Abshire Humphries. Again, Detch seemed to often elicit this testimony himself; and, again, he failed to object when the prejudicial testimony was offered by the witnesses.

McQueen, at the omnibus hearing, testified that a reasonably competent attorney would not open the door to hearsay testimony like that presented in this case and would object to its introduction. We agree. As we recently reiterated in *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), "This Court has explained that '[t]he Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution guarantee an accused the right to confront and cross-examine witnesses.' *State v. Mason*, 194 W.Va. 221, 227, 460 S.E.2d 36, 42 (1995), overruled on other grounds by *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006)." *Id.* at 165 –166. Reasonably competent or effective counsel would seek to protect such a fundamental right. The State and the trial court tried to protect Humphries' rights by offering their own objections to Detch's line of questions and failure to object, for even they feared that Humphries was being "done in" by his defense counsel. We, too, believe that no reasonably competent attorney would have risked his or her client's rights, so the first prong of *Miller* seems, again, to have been met.

 Humphries concludes that the cumulative effect of these errors deprived him of his right to effective counsel, and the State agrees. We, too, agree and find, according to the *Miller* test, that Detch's performance was deficient under an objective standard of reasonableness and that there is a reasonable probability that, but for Detch's errors, the result of Humphries' criminal trial would have been different. We acknowledge Detch's assertion that it was strategy to "put it all out on the table," and we recognize that we have held that "[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). However, we can find no strategic value in Detch's choices at trial, and we feel sure that no reasonable attorney would have pursued a like "strategy." Accordingly, we find that the circuit court erred in finding that Humphries had not suffered ineffective assistance of counsel at his criminal trial.

### B. Violation of Humphries' Fifth Amendment Rights

The second error which Humphries alleges and which the State concedes is that Humphries' Fifth Amendment rights were violated during his criminal trial when reference was made to his failure to give a statement to investigators and his invocation of his right to consult counsel before answering certain questions. This particular issue was neither raised in Humphries' amended petition for habeas corpus relief below, nor was it directly addressed in the lower court's final order denying habeas corpus relief. The matter was raised in testimony given at the omnibus hearing, but only in the context of ineffective assistance of counsel and Detch's failure to address said violations. As we have previously noted, in *State ex rel. Wine v. Bordenkircher, supra,* this Court held that a petitioner for habeas corpus relief cannot introduce new grounds for relief on appeal which were not raised below. Moreover, this Court is prepared to grant relief to Humphries on other grounds; therefore, despite the State's concession of error, we will not address the Fifth Amendment argument on appeal as it was not raised below.

## C. Violation of Humphries' Sixth Amendment Rights

 The third and final issue upon which Humphries seeks relief and to which the State concedes error is the violation of Humphries' Sixth Amendment right to confront the witnesses against him. There were several instances throughout the trial when—often in Detch's own examination of a witness—hearsay testimony was elicited as to what certain people who were not available at trial had said regarding various material issues. The most troubling instances of such conduct involved co-defendants Gene Gaylor, Robert Brown, and Kitty Abshire Humphries, none of whom testified at Humphries' trial. For instance, in cross-examining Trooper Spradlin, Detch elicited testimony as to Kitty's assertion that she and Humphries had never discussed nor formed a plan to acquire a Las Vegas divorce for Kitty.

Spradlin also testified as to what Robert Brown told him, which tended to corroborate the testimony of the State's star witness, Clayton Gaylor. At another point, while questioning Clayton Gaylor about a box he saw in Gene Gaylor's possession, Detch asked "How did you know it was a bomb?" Clayton Gaylor replied, "Because he said so." Another exchange involved both the direct and cross-examinations of Gene Gaylor's ex-wife who testified that Gene Gaylor had met with Humphries in or around November of 1975. When asked how she knew that it was Humphries that her ex-husband met with, she explained that Gene Gaylor told her that it was Humphries. These are but a few examples of the testimony elicited throughout the trial which would tend to constitute hearsay and to deprive Humphries of his right to confront the witnesses against him.

 We have recognized that:

The mission of the Confrontation Clause found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution is to advance a practical concern for the accuracy of the truth-determining process in criminal trials, and the touchstone is whether there has been a satisfactory basis for evaluating the truth of the prior statement. An essential purpose of the Confrontation Clause is to ensure an opportunity for cross-examination. In exercising this right, an accused may cross-examine a witness to reveal possible biases, prejudices, or motives. Syl. Pt. 1, *State v. Mason,* 194 W.Va. 221, 460 S.E.2d 36 (1995).

In Syllabus Point 2 of *State v. James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990), this Court held that "[t]he two central requirements for admission of extrajudicial testimony under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution are: (1) demonstrating the unavailability of the witness to testify; and (2) proving the reliability of the witness's out-of-court statement." In light of subsequent rulings from the United States Supreme Court, we later held: [11]

We modify our holding in *James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990), to comply with the United States Supreme Court's subsequent pronouncements regarding the application of its decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to hold that the unavailability prong of the Confrontation Clause inquiry required by syllabus point one [sic] of *James Edward S.* is only invoked when the challenged extrajudicial statements were made in a prior judicial proceeding. Syl. Pt. 2, *State v. Kennedy,* 205 W.Va. 224, 517 S.E.2d 457 (1999).

---

11. We note that this Court has revisited this matter yet again in *State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006), which was a ruling issued subsequent to the United States Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The law now reflects that:

Pursuant to *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the United States Consti-

tution and Section 14 of Article III of the West Virginia Constitution bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

*Mechling* at Syllabus Point 6. However, *Mechling* is not applicable to this case as the underlying criminal trial herein was conducted prior to the *Crawford* and *Mechling* decisions.

The statements at issue here were not made in prior judicial proceedings, but, rather, during the course of the investigation of the death of Abshire, so it matters not whether the witnesses were unavailable. The question becomes, then, whether the evidence offered bears an "adequate indicia of reliability." In Syllabus Point 5 of *James Edward S.*, supra, we held, "Even though the unavailability requirement has been met, the Confrontation Clause contained in the Sixth Amendment to the United States Constitution mandates the exclusion of evidence that does not bear adequate indicia of reliability. Reliability can usually be inferred where the evidence falls within a firmly rooted hearsay exception." We later clarified that "[f]or purposes of the Confrontation Clause found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception." Syl. Pt. 6, *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995).

The court below found that the statements offered by Gene Gaylor, Brown, and Kitty through various witnesses at trial constituted statements "by co-conspirators during the course and in furtherance of the conspiracy," which, under Rule 801(d)(2)(E), are not hearsay. Therefore, the habeas court concluded that the trial court did not abuse its discretion in allowing the statements. However, as Humphries and the State point out, the most troublesome of the statements offered at trial were made *after* Abshire was dead and, accordingly, *after* the conspiracy had ended. The State asserts that the statements were made not in the furtherance of the conspiracy, but for self-serving purposes ranging from securing reward money to revenge to exculpating the co-conspirators themselves. We agree that there is no exception to the hearsay rule which would allow the statements at issue to come into evidence except through the testimony of those who made the statements.

 Gene Gaylor, Brown, and Kitty did not testify at Humphries' trial, so Humphries had no opportunity to cross-examine them on the damning statements which were offered

through other witnesses. Therefore, Humphries' Sixth Amendment right to confront the witnesses against him was violated, and the habeas court erred in not recognizing that right and in denying relief in habeas corpus. Moreover, "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).

## IV.

## CONCLUSION

Having established that the lower court erred in finding that Humphries did not suffer ineffective assistance of counsel and in finding that his Sixth Amendment rights were not violated, we find that the lower court abused its discretion in denying habeas corpus relief to Humphries. Accordingly, we reverse the decision of the Circuit Court of Greenbrier County and remand the matter for a new criminal trial.

Reversed and remanded for new trial.

STARCHER, J., concurs and files opinion

STARCHER, J., concurring:

I agree with the majority's decision, and the reasoning behind that decision. Numerous errors occurred in the appellant's trial, any one of which standing alone would have been sufficient to support setting aside the conviction. I am bothered, however, by the majority opinion's discussion of the Confrontation Clauses found in the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution*. The majority opinion's discussion relies upon cases that have been overruled at both the state and federal levels, and the discussion therefore might tend to confuse courts and practitioners facing Confrontation Clause questions.

This case centers on a murder that occurred in 1976, and the trial of that crime that occurred in 1999. At the trial, numerous witnesses discussed statements made by people who did not testify, statements that were incriminating to appellant Humphries.

In other words, the out-of-court incriminating words of absent witnesses were offered against Humphries, without Humphries having an opportunity to confront and cross examine those absent witnesses.

The majority opinion analyzes the appellant's Confrontation Clause arguments in light of this Court's holdings in *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), and *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999). These cases all permitted out-of-court statements of witnesses to be used against a criminal defendant if those statements were somehow shown to be "reliable."

In the 2006 case of *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006), this Court plainly overruled *James Edward S., Mason,* and *Kennedy*. As we said in Syllabus Point 7 of *Mechling:*

> To the extent that *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), and *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999), rely upon *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (overruled by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)) and permit the admission of a testimonial statement by a witness who does not appear at trial, regardless of the witness's unavailability for trial and regardless of whether the accused had a prior opportunity to cross-examine the witness, those cases are overruled.

The reliability scheme of analysis in those three cases was replaced with a somewhat simpler rule, one that completely bars the admission of testimonial-type, out-of-court statements by a witness who does not appear at trial. As we said in Syllabus Point 6 of *Mechling:*

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution bars the admission of a testimonial statement by a witness who does not ap-

pear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

The question of whether *Mechling* is retroactive has never been answered by this Court. However, by any system of analysis, the appellant in this case was deprived of his constitutional right to confront witnesses making statements against him. Readers should simply keep in mind that the majority opinion expends five lengthy paragraphs analyzing the inadmissibility of the numerous out-of-court statements used against the appellant under an outdated, overruled analytical scheme.

Still, I concur.