735 S.E.2d 905

**STATE of West Virginia, Plaintiff Below, Respondent**

**v.**

**Franklin Junior KENNEDY, Defendant Below, Petitioner.**

No. 11–0223.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 16, 2012.

Decided Nov. 21, 2012.

Steven K. Mancini, Esq., Beckley, WV, for Petitioner.

Darrell V. McGraw, Jr., Esq., Attorney General, Barbara H. Allen, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

WORKMAN, Justice:

Petitioner Franklin Junior Kennedy (hereinafter "Kennedy") appeals the Circuit Court of McDowell County's September 23, 2010,

order denying his motion for a new trial. Kennedy was convicted in 1996 of the first degree murder of Lashonda Viars and sentenced to life in prison with mercy. This is Kennedy's second appeal of that conviction; his conviction was first upheld on direct appeal to this Court in 1999 in *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999), *overruled by State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006) (hereinafter "*Kennedy I*"). In his initial appeal, among other assignments of error, Kennedy asserted that admission of an autopsy report without the accompanying testimony of the authoring pathologist violated the Confrontation Clause of the United States and West Virginia Constitutions. As a result of our decision in *Mechling* (which overruled *Kennedy I* as to our holding on the Confrontation Clause issue), Kennedy filed another motion for a new trial. The circuit court denied the motion; this appeal followed. Although we agree that admission of the autopsy report and testimony reiterating its contents violated the Confrontation Clause under our current caselaw, for the reasons that follow, this Court affirms the circuit court's denial of Kennedy's motion for new trial.

## I. FACTS AND PROCEDURAL HISTORY

On July 28, 1994, the body of fifteen-year-old Lashonda Viars was found in Bartley, West Virginia; she died as the result of a head wound. Kennedy was arrested the same day and charged with murder. At Kennedy's trial, the State introduced a blood sample of the victim found on the exterior of Kennedy's vehicle, testimony that Viars was spotted arguing with Kennedy on the night of the murder, an eyewitness placing Kennedy's vehicle at the location where the body was discovered, a separate eyewitness who saw Kennedy on the night of the murder

with blood on his arm, and forensic testimony regarding cause of death.

To provide the forensic testimony, the State called Dr. Zia Sabet, a pathologist with the State Medical Examiner's office. During Dr. Sabet's testimony, the State also introduced the autopsy report which had been prepared by Dr. Samuel Livingston, a pathologist formerly with the Medical Examiner's Office, and photographs from the autopsy. Dr. Livingston had moved to Syracuse, New York at the time of trial and did not testify. The autopsy report, over objection of defense counsel,[1] was admitted into evidence; the defense did not object to the autopsy photographs. The autopsy report contained a description of the body, the wounds, the results of microscopic examination, as well as Dr. Livingston's "diagnoses" and "opinion." [2]

Dr. Sabet offered testimony regarding the general methodology of performing autopsies and utilized the autopsy photographs to illustrate various types of injuries found on the victim. He then testified that the cause of death was "multiple blunt force trauma to the head." Dr. Sabet also offered testimony about observations he made during his review of the autopsy photographs and the victim's clothing; in particular, he noted nonfatal stab wounds on the victim which were consistent with use of a screwdriver and tire marks on the victim's clothing which suggested that her clothes had been run over by a vehicle. Finally, Dr. Sabet opined that, based upon the autopsy photographs, the victim's injuries were not consistent with being struck by a rock.

Significantly, Kennedy testified in his own defense and contended that his wife, Tonya Kennedy, had committed the murder, which he observed in part, and that he had merely assisted in disposing of the body. Prior to the trial, Kennedy gave a statement to police that he witnessed his wife beating Viars in the head with a rock or brick after a brief

---

1. Defense counsel objected on the basis of "lack of foundation."

2. DIAGNOSES:
   1. Cerebral edema and concussion secondary to multiple blunt force impacts to head.
   2. Multiple abrasions, contusion, and lacerations over upper body, neck and head.
   OPINION:

In consideration of the circumstances surrounding death, age of decedent and findings noted upon autopsy of body, the death of Lashonda Viars, a 16 [sic] year old white female, is considered due to multiple blunt force injuries of head. The manner of death is homicide.

verbal altercation at a local convenience store, which assault led to her death. However, at trial, following the testimony of Dr. Zia Sabet, who opined that Viars' injuries were not consistent with being beaten with a rock, Kennedy testified that his wife did not strike the victim directly with the rock or brick, but had actually held it in her hand to "stouten up" her fist. The jury found Kennedy guilty of first degree murder and he was sentenced to life in prison with mercy.

After the verdict, Kennedy filed two motions for a new trial—both of which were denied and collectively appealed to this Court. Among other assignments of error, Kennedy argued that his Sixth Amendment rights were violated by the admission of the autopsy report and Dr. Sabet's testimony regarding the report.[3] Specifically, Kennedy argued that the State had failed to demonstrate that Dr. Livingston was "unavailable" in accordance with Syl. Pt. 2, *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990) and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)(permitting admission of testimonial hearsay only where the declarant is unavailable and the hearsay has been demonstrated to be reliable). *Kennedy I* at 227, 517 S.E.2d at 460–61. This Court, adopting the United States Supreme Court's holdings in *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), held that the Confrontation Clause restrictions on admission of testimonial hearsay set forth in *James Edward S.* and *Roberts* applied only to testimonial hearsay from a prior judicial proceeding. *Kennedy* at 229, 517 S.E.2d at 462.

Subsequent to our decision in *Kennedy I*, the United States Supreme Court abrogated its holding in *Roberts*, issuing a unanimous majority opinion which held that the Confrontation Clause barred admission of testimonial hearsay unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In 2006, this Court adopted *Crawford* in *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006) expressly overruling *Kennedy I* as well as *James Edward S.*, upon which Kennedy's previous conviction was, in part, affirmed. This Court did not, however, indicate whether *Mechling* was to be applied retroactively.

In August, 2010–fourteen years after his conviction, eleven years after this Court affirmed his conviction on direct appeal, and four years after our decision in *Mechling*–Kennedy filed yet another motion for new trial. Although Kennedy contends that his right of confrontation under the Sixth Amendment to the United States Constitution and Section 14, Article III of the West Virginia Constitution was violated by the admission of the autopsy report and Dr. Sabet's testimony, he moved for a new trial pursuant to Rule 33 of the West Virginia Rules of Criminal Procedure rather than filing a writ of habeas corpus.[4] The trial court denied Kennedy's motion on essentially two bases: 1) an autopsy report is non-testimonial hearsay and therefore does not implicate *Crawford/Mechling*; and 2) Kennedy failed to preserve the Confrontation Clause issue for appeal.[5] Kennedy now appeals this rul-

---

3. Kennedy also asserted prosecutorial misconduct, newly-discovered evidence, and error regarding instructions given concerning a rejected plea agreement. This Court found no merit to these assignments of error. *Kennedy I* at 227, 517 S.E.2d at 460.

4. Rule 33 provides:
The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only after final

judgment, but if an appeal is pending the court may grant the motion only on remand of the case. ·A motion for a new trial based on any other grounds shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

5. In *Kennedy I*, this Court noted that although Kennedy's objection to the autopsy report was insufficient to preserve the Confrontation Clause error for appeal, we chose to address the issue given the modifications to state law which occurred subsequent to Kennedy's trial. *Id.* at 228 n. 5, 517 S.E.2d at 461 n. 5. We again choose in this appeal to address this issue in light of the substantial changes to Confrontation Clause ju-

ing, contending that despite the lapse of time since his conviction and appeal, this constitutes a "direct" appeal.

## II. STANDARD OF REVIEW

■ This Court has previously held that:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). We have further recognized that "[i]t is well settled that a trial court's rulings on the admissibility of evidence, 'including those affecting constitutional rights, are reviewed under an abuse of discretion standard.'" *State v. Kaufman*, 227 W.Va. 537, 548, 711 S.E.2d 607, 618 (2011) (citing *State v. Marple*, 197 W.Va. 47, 51, 475 S.E.2d 47, 51 (1996)). Moreover, for the reasons more fully set forth in Section D, *infra*, we also note that the standard of review upon a writ of habeas corpus is the same as that set forth in *Vance*.

## III. DISCUSSION

### A.

We first address Kennedy's contention that admission of the autopsy report violated the Confrontation Clause. Kennedy contends that the autopsy report constitutes "testimonial hearsay" and that once the State sought to introduce the autopsy report, the Confrontation Clause required that he be permitted to cross-examine Dr. Livingston,

the pathologist who performed the autopsy. Notably, the State concedes that under current caselaw, the autopsy report was testimonial and therefore its admission was, in fact, error.[6]

■ This Court has held that "[t]he Confrontation Clause contained in the Sixth Amendment to the United States Constitution provides: 'In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him.' This clause was made applicable to the states through the Fourteenth Amendment to the United States Constitution." Syl. Pt. 1, *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *overruled on other grounds by State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). Since our decision in *James Edward S.*, the body of jurisprudence surrounding the application of the Confrontation Clause has undergone a sweeping change, and continues to evolve on both a state and federal level—a fact which is well-illustrated in this case alone.

We recently undertook a thorough and methodical overview of the evolution of Confrontation Clause jurisprudence in *State v. Kaufman, supra*, which need not be reiterated in its entirety herein. However, a brief discussion of the development of that caselaw and its application to this particular case is necessary for context.

At the time of Kennedy's initial appeal, wherein we addressed the Confrontation Clause's requirements with respect to admission of the autopsy report, our holding was constrained by the United States Supreme Court's decision in *Roberts, supra*, which we adopted in *James Edward S.*: "The two central requirements for admission of extrajudicial testimony under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution are: (1) dem-

---

risprudence which have occurred subsequent to *Kennedy I*.

**6.** However, the State contends that this error was in any event harmless. Specifically, the State's attorney contended during oral argument that admission of the autopsy report was not critical to the proof of *corpus delicti*. This Court has held "[t]o prove the *corpus delicti* in a case of homicide two facts must be established: (1) The

death of a human being and (2) a criminal agency as its cause." Syl. Pt. 4, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983). The State contends that the investigating officers who discovered the body properly provided testimony sufficient to establish *corpus delicti*. However, for the reasons set forth in Section D, *infra*, we need not address this issue.

onstrating the unavailability of the witness to testify; and (2) proving the reliability of the witness's out-of-court statement." *Kennedy,* 205 W.Va. at 228, 517 S.E.2d at 461 (citing Syl. Pt. 2, *James Edward S., supra* ). We then adopted the holding of a more recent United States Supreme Court case, *White v. Illinois, supra,* which restricted application of *Roberts* to statements made in prior judicial proceedings:

> We modify our holding in *James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990), to comply with the United States Supreme Court's subsequent pronouncements regarding the application of its decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to hold that the unavailability prong of the Confrontation Clause inquiry required by syllabus point one of *James Edward S.* is only invoked when the challenged extrajudicial statements were made in a prior judicial proceeding.

Syl. Pt. 2, *Kennedy I, supra.* As a result, we determined that no Confrontation Clause violation had occurred since the autopsy report was not a statement made in a prior judicial proceeding. *Id.* at 229, 517 S.E.2d at 462. We further found that even in absence of the limited application endorsed in *Roberts* and *James Edward S.* to statements made in prior judicial proceedings, the autopsy report fell within a firmly rooted hearsay exception for public records.[7] *Id.* at 229–30, 517 S.E.2d at 462–63.

We noted further that the Office of Medical Examiners was required by statute to "[k]eep full, complete, and properly indexed records of all deaths investigated, containing all relevant information concerning the death, and the autopsy report if such be made." *Id.* at 230 n. 10, 517 S.E.2d at 463 n. 10 (citing W. Va.Code § 61–12–10 (1997)). Significantly, we found that W. Va.Code § 61–12–13 (1997) compelled courts to admit autopsy reports into evidence. *Id.* W. Va. Code § 61–12–13 provides:

---

7. W.V.R.E. 803(8) provides, in pertinent part:
   Public records and reports.-Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ...
   (B) matters observed pursuant to duty imposed

*Reports of investigations and autopsies, and the records thereof, on file in the Office of the Chief Medical Examiner or in the office of any county medical examiner, shall be received as evidence in any court or other proceeding,* and copies of records, photographs, laboratory findings and records on file in the Office of the Chief Medical Examiner or in the office of any county medical examiner, when duly attested by the Chief Medical Examiner or by the county medical examiner, assistant county medical examiner or coroner in whose office the same are filed, shall be received as evidence in any court or other proceeding for any purpose for which the original could be received without any proof of the official character of the person whose name is signed thereto unless objected to by counsel: Provided, That statements of witnesses or other persons and conclusions upon extraneous matters are not hereby made admissible.

(emphasis added).

As indicated above, subsequent to *Kennedy I,* the United States Supreme Court abrogated its holding in *Roberts* in *Crawford v. Washington, supra,* holding that "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Court noted that admission of non-testimonial hearsay would continue to be policed by the Rules of Evidence, but that as to testimonial hearsay, the Sixth Amendment's protections could not be left to "the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* at 61, 124 S.Ct. 1354.

■ In 2006, this Court adopted *Crawford* in *State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006), and expressly overruled *Kennedy I* and *James Edward S.,* upon which Kennedy's previous conviction was, in part, affirmed:

> by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel[.]

Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

To the extent that *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), and *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999), rely upon *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (*overruled by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)) and permit the admission of a testimonial statement by a witness who does not appear at trial, regardless of the witness's unavailability for trial and regardless of whether the accused had a prior opportunity to cross-examine the witness, those cases are overruled.

Syl. Pts. 6 and 7, *Mechling, supra.*

Kennedy now asks this Court, in light of *Crawford* and *Mechling*, to revisit the constitutionality of admission of the autopsy report. More specifically, Kennedy contends that the autopsy report, as forensic documentary hearsay, is now governed by *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). In *Melendez–Diaz*, the defendant challenged the admissibility of certificates of analysis which identified seized material as cocaine. *Id.* at 308–09, 129 S.Ct. 2527. The Court found that the certificates constituted affidavits which fell squarely within the "core class" of testimonial materials established in *Crawford*. *Id.* at 310, 129 S.Ct. 2527. As such, the analysts who prepared the certificates were witnesses that the defendant had the right to confront at trial. *Id.* at 311, 129 S.Ct. 2527. In dismissing a variety of arguments suggesting that forensic testing results were inherently reliable and not susceptible to typical weaknesses revealed on cross-examination, the majority noted that its criti-

cal observation in *Crawford* was no less true in the instance of forensic analysis:

> "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . .
>
> Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty."

*Melendez–Diaz*, 557 U.S. at 317–18, 129 S.Ct. 2527 (quoting *Crawford*, 541 U.S. at 61–62, 124 S.Ct. 1354). The Court noted that "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Id.* at 319, 129 S.Ct. 2527. Notably, the Court expressly rejected the argument that the certificates were tantamount to traditional business records and noted that even if they were, "their authors would be subject to confrontation nonetheless." *Id.* at 321, 129 S.Ct. 2527. The Court noted that regardless of form, it was clear that the analysts' certificates were "prepared specifically for use at petitioner's trial." *Id.* at 324, 129 S.Ct. 2527.

■ Since it is clear that Kennedy did not have a "prior opportunity to cross-examine" Dr. Livingston, admission of the autopsy report violates the Confrontation Clause to the extent that it constitutes a "testimonial" hearsay. In defining what constitutes "testimonial" hearsay, the United States Supreme Court initially refused to establish strict boundaries, opting instead to provide, as a starting point, a "core class" of testimonial materials that may be broadened by use of the "primary purpose" test. The core class of testimonial materials endorsed in *Crawford* consists of

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affi-

davits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354 (citations omitted). Thereafter, in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court developed the "primary purpose" test to encompass that evidence which may not fall squarely into the core class. The primary purpose test states that a statement is "testimonial" if the "primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 S.Ct. 2266. Since that time, the United States Supreme Court has reiterated that the "primary purpose" test focuses the inquiry on whether the evidence was "for the purpose of establishing or proving some fact at trial" *Melendez–Diaz,* 557 U.S. at 310–11, 129 S.Ct. 2527; *see also Bullcoming v. New Mexico,* 564 U.S. ——, 131 S.Ct. 2705, 2714 n. 6, 180 L.Ed.2d 610 (2011)(reiterating "primary purpose" test and finding laboratory results introduced by "surrogate" expert violative of the Confrontation Clause).[8] Consistent with these decisions, this Court has adopted the following iteration of the "primary purpose" test to determine if a statement is "testimonial":

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution,* a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Syl. Pt. 8, *Mechling, supra.*

These principles were recently utilized by the Eleventh Circuit to assess whether au-

topsy reports admitted into evidence were testimonial and therefore barred by the Confrontation Clause. In *United States v. Ignasiak,* 667 F.3d 1217, 1232 (11th Cir.2012), the court found that autopsy reports, which had been admitted into evidence pursuant to F.R.E. 803(b) as "business records," in absence of their authors' testimony, violated the Confrontation Clause because they were made for purposes of "use at trial." Examining the Florida statutes which empower the medical examiner, the court found that law enforcement and the medical examiner's duties were closely intertwined and that autopsy reports were prepared, in large part, for use at trial. *Id.* at 1231–32. The court highlighted the close relationship between law enforcement and the medical examiner and noted that the testifying expert explained that she "relied upon information collected by 'deputies on the scene' in her investigation[.]" *Id.* at 1232 n. 17. The court further identified a multitude of other jurisdictions which had found autopsy reports to be testimonial hearsay subject to the Confrontation Clause. *Id.* at 1231 n. 15 (citing collection of cases finding autopsy reports "testimonial").

However, despite what appeared to be a fluid and fairly broad outline of statements which are potentially "testimonial," a *plurality* opinion of the United States Supreme Court has recently seemingly attempted to put a much finer point on the "primary purpose" test. In *Williams v. Illinois,* 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), four members of the Court found that a DNA laboratory report relied upon by a testifying expert was not testimonial hearsay for Confrontation Clause purposes. The Court distinguished the laboratory reports in *Melendez–Diaz* and *Bullcoming* from the laboratory report in *Williams* because the report in *Williams* did not have the "primary purpose of accusing *a targeted individual* of engaging in criminal conduct[.]" *Id.* at 2242 (emphasis added).[9] In particular, the Court

---

**8.** Since the test, in its entirety, directs consideration of whether the testimony has the "primary purpose" of "establishing or proving some fact at trial," courts have alternately referred to the test as the "primary purpose" test or the "use at trial" test. For the sake of consistency, this

Court will refer to it as the "primary purpose" test herein.

**9.** However, the Court occasionally seemed to suggest that the "targeted individual" element may be construed in the disjunctive, as an alter-

stated that "[i]ntroduction of the reports in [*Melendez–Diaz* and *Bullcoming* ] ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt *of a particular criminal defendant* at trial." *Id.* at 2243 (emphasis added).

Although the plurality opinion did not acknowledge this as a "new" test for determining whether hearsay is testimonial, both the dissent and Justice Thomas' concurrence construed it as such and remarked on this abruptly newfound requirement. Justice Thomas stated that this test "lacks any grounding in constitutional text, in history, or in logic." *Id.* at 2262 (Thomas, J., concurring). In the dissent, Justice Kagan remarked that,

> the plurality states that the Cellmark report was "not prepared for the primary purpose of accusing a targeted individual." Where that test comes from is anyone's guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in *Melendez–Diaz*, we rejected a related argument that laboratory "analysts are not subject to confrontation because they are not 'accusatory' witnesses."

*Id.* at 2273–74 (Kagan, J., dissenting) (citations omitted).

Accordingly, we view *Williams* with caution. As noted, *Williams* is a fractured plurality opinion. Justices Alito, Kennedy, Breyer, Roberts, and Thomas (the swing vote) voted to affirm; however, Thomas wrote separately joining in the affirmation, but rejecting virtually the entirety of the plurality's opinion. Thomas would affirm on

the basis that the DNA laboratory report did not meet the "formality and solemnity" required to constitute "testimonial hearsay." *Id.* at 2261 (Thomas, J., concurring). Justice Thomas had previously joined Justices Scalia, Ginsburg, Kagan and Sotomayor in the majority in *Melendez–Diaz* and *Bullcoming,* but "switched sides" in *Williams* for purposes of the outcome only, not the rationale. The dissent aptly notes that the plurality opinion very clearly flies in the face of the *Crawford* line of cases leading up to *Williams,* specifically *Melendez–Diaz* and *Bullcoming.* The dissent also warns litigants to continue to adhere to the holdings of *Melendez–Diaz* and *Bullcoming* due to the lack of majority support for the holdings in *Williams.* *Id.* at 2277 (Kagan, J., dissenting).

The United States Supreme Court has held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ...'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citing *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). As such, we believe *Williams* cannot be fairly read to supplant the "primary purpose" test previously endorsed by the Court and as established in *Melendez–Diaz* and *Bullcoming.* However, for purposes of this particular case, we need not determine what the "narrowest grounds" obtaining concurrence in *Williams* are, or whether there are any such grounds, for that matter. The autopsy report at issue appears to unquestionably qualify as testimonial hearsay.

First, and perhaps most compellingly, the autopsy and required report's use in judicial proceedings is one of its statutorily defined purposes. The autopsy report is the written embodiment of the work of the medical examiner. Like the Florida statutes examined in *Ignasiak,* in setting forth the medical ex-

---

native to the "primary purpose" test: "Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner *or* to

create evidence for use at trial." *Id.* (emphasis added)

aminer's duties, our Legislature specifically noted that with respect to "death investigations," the medical examiner operates with independent authority and, in that regard, part of his duties is to develop opinions for use in judicial proceedings:

"The Chief Medical Examiner shall be responsible to the Director of the Division of Health in all matters except that the Chief Medical Examiner shall operate with independent authority for the purposes of:

(1) The performance of death investigations conducted pursuant to section eight [§ 61–12–8] of this article; (2) The establishment of cause and manner of death; and (3) *The formulation of conclusions, opinions or testimony in judicial proceedings.*"

W. Va.Code § 61–12–3(d)(Repl.Vol.2010) (emphasis added). As such, under the "primary purpose" test, there is no question that the report is testimonial. Moreover, in this particular instance, Kennedy was under suspicion and in fact, in custody, when the autopsy was conducted and therefore the autopsy report could arguably be said to have been prepared to "accuse a targeted individual" and therefore appears to pass muster as "testimonial" under *Williams* as well.[10]

■ Accordingly, we find that the trial court's determination that the autopsy report was not testimonial to be error. However, we do not confine this conclusion to the facts of this case. W. Va.Code § 61–12–3(d) com-

pels the conclusion that, for purposes of use in criminal prosecutions, autopsy reports are under all circumstances testimonial. Therefore, to the extent that W. Va.Code § 61–12–13 (Repl.Vol.2010) compels the mandatory admission of an autopsy report or other testimonial document, in a criminal action, where the performing pathologist or analyst does not appear at trial and the State fails to establish that the pathologist or analyst is unavailable and that the accused has had a prior opportunity to cross-examine the witness, it is unconstitutional and unenforceable.

**B.**

■ We next address the issue of whether Dr. Sabet's testimony likewise violated the Confrontation Clause. Although our analysis of this issue was far briefer in *Kennedy I,* we did find that Dr. Sabet "was properly permitted by the trial court to give testimony based on the autopsy report prepared by Dr. Livingston." *Kennedy,* 205 W.Va. at 231, 517 S.E.2d at 464. In support of this finding, we noted our well-established holding that " '[a]ny physician qualified as an expert may give an opinion about physical and medical cause of injury or death' and that '[t]his opinion may be based in part on an autopsy report.' " *Id.* (quoting Syl. Pt. 5, *State v. Jackson,* 171 W.Va. 329, 298 S.E.2d 866 (1982)); *see also State v. Linkous,* 177 W.Va. 621, 625 n. 3, 355 S.E.2d 410, 414 n. 3 (1987). Although we did not engage in an exhaustive

**10.** Although the autopsy report at issue does not, in and of itself, prove the guilt of Kennedy and is not inherently inculpatory, it is distinguishable from the laboratory report in *Williams* in that the laboratory report was created "to catch a dangerous rapist who was still at large, not to obtain evidence for use against [Williams], who was neither in custody nor under suspicion at that time." *Williams,* 132 S.Ct. at 2243. In the instant case, Kennedy was arrested the day Viars' body was discovered; therefore, the autopsy report necessarily became part of the case being assembled against him. In fact, Dr. Sabet testified, as did the expert in *Ignasiak,* that law enforcement officers are present during the autopsy, providing a "detailed history" and engaging in a dialogue with the medical examiner about cause of death. In such an event where a suspect is in custody (suggesting that a considerable body of evidence against him is already present), certainly this dialogue suggests a collaborative investigative

effort in making the case against a suspect— connecting the scientific evidence to the other direct or circumstantial evidence which will form the basis of the prosecution. Viewed under the totality of the circumstances, the autopsy report transforms from a clinical compilation of objective observations and academic opinions derived therefrom to an integrally interwoven part of a criminal prosecution which presumably serves as scientific corroboration of the prosecution's case. As such, the *Williams* plurality's "targeted defendant" analysis is useful, if for no other purpose than to highlight the prosecutorial nature of certain forensic evidence warranting Confrontation Clause scrutiny. Nevertheless, as noted *infra,* the determination as to whether the autopsy report is testimonial continues to be driven by the "primary purpose" test adopted by this Court in *Mechling* and as applied by the United States Supreme Court in *Melendez–Diaz* and *Bullcoming.*

analysis of the many facets of Dr. Sabet's testimony, we did address specifically Kennedy's contention that Dr. Sabet was improperly permitted to testify regarding the stab wounds on the victim's body, finding that such testimony was "a conclusion independently reached by Dr. Sabet and he was available for cross-examination at trial on this issue." *Id.*

The State contends that Dr. Sabet's testimony did not violate the Confrontation Clause for two reasons. First, although the State treats Dr. Sabet's testimony somewhat summarily, it contends that Dr. Sabet testified regarding the various wounds on the victim's body on the basis of his review of the autopsy photographs and therefore, that testimony was Dr. Sabet's own opinion which Kennedy had the opportunity to cross-examine. Secondly, the State contends that to the extent Dr. Sabet relied upon the now-inadmissible autopsy report in formulating any of the opinions he offers, West Virginia Rule of Evidence 703 expressly permits an expert to rely on otherwise inadmissible evidence as a basis of his opinion:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

With respect to an expert's discussion of inadmissible "basis" evidence, we have held that the trial court must weigh its probative value and offer a limiting instruction to the jury:

> An expert witness may testify about facts he/she reasonably relied upon to form his/her opinion even though such facts would otherwise be inadmissible as hearsay if the trial court determines that the probative value of allowing such testimony to aid the

jury's evaluation of the expert's opinion substantially outweighs its prejudicial effect. If a trial court admits such testimony, the jury should be instructed that the otherwise inadmissible factual evidence is not being admitted to establish the truth thereof but solely for the limited purpose of informing the jury of the basis for the expert's opinion.

Syl. Pt. 3, *Doe v. Wal–Mart Stores, Inc.,* 210 W.Va. 664, 558 S.E.2d 663 (2001).[11]

Obviously, in light of the developments in this area of the law, the continued validity of *Jackson* and the applicability of W.V.R.E. 703 to testimonial "basis" hearsay must now be examined. The United States Supreme Court first had occasion to assess the use of so-called "surrogate" expert testimony to introduce forensic testimonial hearsay in view of *Crawford* and its progeny in *Bullcoming v. New Mexico, supra.* In *Bullcoming,* the Court held that the Confrontation Clause was violated when the State introduced evidence of defendant's blood-alcohol level through the testimony of a laboratory analyst who had neither participated in nor observed testing on the blood sample. Principal evidence against the defendant was a forensic laboratory report certifying that his blood-alcohol concentration was above the threshold for aggravated DWI. *Id.* at 2709. The State called a "surrogate" analyst who was familiar with the laboratory's testing procedures, but had not participated in the testing. *Id.* In sum, the Court found that the surrogate was insufficient for Confrontation Clause purposes because he "could not convey what [the certifying analyst] knew or observed about the events his certification concerned.... Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." *Id.* at 2715. As such, the Court held "[i]n short, when the State elected to introduce [the certifying analyst's] certification, [the analyst] became a witness

11. *See also* Federal Rule of Evidence 703, as amended, incorporating a similar balancing test:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an

> opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Bullcoming had the right to confront. Our precedent cannot sensibly be read any other way." *Id.* at 2716.

Significantly, Justice Sotomayor's concurring opinion in *Bullcoming* expressly described situations which *Bullcoming* did *not* address, thereby carving out four fact-specific scenarios the outcome of which may not be dictated entirely by *Bullcoming.* First, she noted that *Bullcoming* is not a case where the introduction of the blood-alcohol report was prepared for an alternate purpose such as providing medical treatment. *Id.* at 2722 (Sotomayor, J., concurring). Rather, it was prepared expressly for use at trial. Second, she noted that the surrogate expert was not a "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* Rather, the surrogate "played no role in producing the BAC report and did not observe any portion of [the analyst's] conduct of the testing." *Id.* In addition, she noted that the State did not merely introduce raw data or machine-generated results which may form the basis of an expert's opinion. *Id.* Most importantly for the case *sub judice,* Justice Sotomayor noted that "this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* Citing Rule 703 of the Federal Rules of Evidence regarding an expert's ability to rely on inadmissible evidence to formulate his opinion, she states that "[w]e would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." *Id.*[12]

The Supreme Court confronted this specific question in *Williams, supra,* although with a less than unanimous (and hotly criticized by the dissent) rationale. As noted above, the *Williams* Court examined a laboratory report the author of which did not testify at trial, and upon which the testifying or "surrogate" expert relied to offer testimony. The expert utilized certain DNA testing results

(generated by Cellmark labs establishing a DNA profile from the victim's vaginal swab) to create a "match" to the DNA profile she generated from the defendant. *Id.* at 2230 (plurality opinion). Although the plurality determined the laboratory report not to be testimonial, as discussed *supra,* it also determined that as "basis" evidence, the report was not offered for its truth. *Id.* at 2239–40. To reach this conclusion, the Court reiterated that the threshold finding before launching into a Confrontation Clause analysis is that the testimony, in fact, be hearsay: "[T]he Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *Id.* at 2235 (citing *Crawford,* 541 U.S. at 59–60 n. 9, 124 S.Ct. 1354).

However, the Court made several critical factual distinctions which are particularly pertinent to the case at bar. First, the Court noted repeatedly that Williams was afforded a bench trial, and that therefore concerns about a jury erroneously accepting the report "for the substantive purpose of proving the truth of the matter asserted by its out-of-court author" as opposed to the "predicate facts" of the surrogate expert's testimony, was non-existent. *Id.* at 2233, 2239. Secondly, and more importantly, "[t]he [ ] report itself was neither admitted into evidence nor shown to the factfinder. [The surrogate expert] did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed." *Id.* at 2230.

Again, however, we construe *Williams* with extreme caution and admonish lower courts to do likewise. Like the plurality's rationale regarding what constitutes a "testimonial" piece of forensic evidence, its determination that the laboratory report at issue was not offered for its truth was vehemently dismissed by both Justice Thomas in his concurrence and the dissent. Justice Thomas concluded that "[t]here is no meaningful distinction between discussing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing

---

**12.** The second and third scenarios which Justice Sotomayor described have been, in large part, the bases upon which most courts have distin-

guished their post-*Bullcoming* cases to permit the allegedly offending testimony by "surrogate" experts.

that statement for its truth." *Id.* at 2257 (Thomas, J., concurring). Justice Kagan noted in rejecting this conclusion that "to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies." *Id.* at 2268–69 (Kagan, J., dissenting). She further opined that the plurality provides the State with "a ready method to bypass the Constitution" in that "[i]f the Confrontation Clause prevents the State from getting its evidence in through the front door, then the State could sneak it in through the back. What a neat trick—but really, what a way to run a criminal justice system. No wonder five Justices reject it." *Id.* at 2270, 2272. Given the factual distinctions involved in *Williams* including the use of a bench trial, the fact that the laboratory report was not itself admitted into evidence, and the fact that the plurality ultimately found the laboratory report non-testimonial, it may be fairly said that the issue of whether *and to what extent* an expert may rely upon and/or then disclose (even with a limiting instruction) as a predicate fact, testimonial hearsay, is unanswered by *Williams.* However, given the dissent and Justice Thomas' concurrence, it is not difficult to surmise that a true majority of the Court would find such testimony, particularly if the underlying testimonial evidence was disclosed to a jury, to be offered for its truth and therefore, violative of the Confrontation Clause.

With these considerations in mind, we turn to the specific content of Dr. Sabet's testimony. Dr. Sabet testified that in preparation for his testimony, he reviewed Dr. Livingston's report and the contents of the Medical Examiner's office's file, including photographs and the victim's clothing. Dr. Sabet then offered three discrete opinions: (1) that Viars' died as a result of multiple blunt force injury of the head; (2) that, in reviewing the autopsy photographs and examining her clothing, he observed stab wounds consistent with a screwdriver and tire marks on her clothing; and (3) that her injuries were inconsistent with being struck by a rock.

As to the cause of death, it is evident that Dr. Sabet was merely reiterating the contents of the autopsy report prepared by Dr. Livingston. The State elicited testimony regarding the cause of death by inquiring about the conclusion of *the Medical Examiner's office:*

Q. From the complete external and internal examination of the body of Lashonda Viars, did the office of the Medical Examiner reach a conclusion as to the cause of her death?

A. Yes, sir.

Q. What caused her death?

A. She died of multiple blunt force injury of the head, old, causing acute subdural, subarachnoid hemorrhage. Hemorrhage bleeding is, from brain bleeding.

At the close of Dr. Sabet's testimony, counsel reformulated his question slightly:

Q. The cause [of death] was, *in your opinion* to a reasonable degree of medical certainty, blunt force trauma to the head?

A. Absolutely.

(emphasis added). However, lest there be any confusion about "whose" opinion was being offered as to cause of death, on cross-examination, defense counsel inquired as to the source of the various opinions expressed by Dr. Sabet:

Q. Now, the conclusions that you express, are those the conclusions of Dr. Livingston or the conclusions of yourself?

A. Ah, *the cause and manner of death is exactly the same as Dr. Livingston mentioned and I read it from this file that he dictated,* but the entire [sic] imprint on the clothing and stab wounds based on my experience and looking at the pictures and looking at the clothing, I find— I added to this report.

Q. You added to the original conclusion of Dr. Livingston?

A. That's correct, but these [stab wounds] are not fatal.

(emphasis added). As such, to the extent that Dr. Sabet served as a "transmitter" for Dr. Livingston's opinions regarding cause of death by reading or reiterating the conclu-

sions contained from the report, such testimony is precisely the type of "surrogate" testimony that is violative of the Confrontation Clause per *Bullcoming*. Dr. Sabet's seeming concurrence with the cause of death, does not transform it into his own opinion, capable of cross-examination sufficient for Confrontation Clause purposes. As the *Ignasiak* court likewise noted with respect to similar testimony therein:

> That Dr. Minyard may have briefly expressed her own independent agreement with the non-testifying medical examiner's conclusions regarding cause of death only compounded the Confrontation Clause error that occurred. Because Dr. Minyard had neither performed nor been present during the autopsies in question, she was not in a position to testify on cross-examination ... whether any errors, omissions, or mistakes were made.... Yet Dr. Minyard gave her professional imprimatur to this effect.

*Ignasiak*, 667 F.3d at 1234.

■ On the other hand, as to the opinions regarding the non-fatal stab wounds and tire markings, it is equally clear that these are original observations and opinions developed by Dr. Sabet himself. Dr. Sabet unequivocally testified that these were additional opinions he derived from inspection of the clothing and autopsy photographs; they are mentioned nowhere in the autopsy report itself. As such, given that Dr. Sabet was available for cross-examination on these original opinions, no Confrontation Clause violation occurred in the admission of this testimony.

■ However, it is the third opinion—whether Viars' injuries were consistent with being struck by a rock—which more squarely implicates the issue purportedly resolved in *Williams*. It is, not surprisingly, this opinion with which Kennedy takes the greatest issue given that this opinion directly contradicts Kennedy's defense, i.e. that his wife killed Viars using a rock.[13] The State contends that this is likewise an "original" opinion of Dr. Sabet, upon which the autopsy report is silent, and which was reached on the basis of the admitted autopsy photographs (to which there was no objection). However, our review of Dr. Sabet's testimony reveals that the record is simply silent as to the basis of Dr. Sabet's opinions in this regard. It is certainly possible that Dr. Sabet based this testimony on his review of the head wounds depicted in the autopsy photographs; however, it is likewise possible that all or some portion of this opinion is based upon the absence of a description in the autopsy report that the wounds observed first-hand by Dr. Livingston resembled those that Dr. Sabet would expect to be present if Viars had been struck by a rock. Kennedy posits simply that he was entitled to cross examine Dr. Livingston on this "additional" opinion of Dr. Sabet.

We find that inasmuch as there is no evidence in the record upon which to conclude that Dr. Sabet based his opinions regarding a rock as the mechanism of injury on the autopsy report, we cannot conclude that his testimony on this issue was error. In this regard, we find it significant that Dr. Sabet did not reference or read from the report in support of his opinion that Viars' injuries were not inflicted with a rock. Nor did defense counsel elicit testimony suggesting that this opinion was not an "original" opinion of Dr. Sabet, as defense counsel elicited regarding cause and manner of death. Clearly, Dr. Sabet was not necessarily constrained to the contents of the report, given the existence of the autopsy photographs, which would permit him to make his own, individualized observations of the wounds and determine if they were consistent with being inflicted by a rock. It is this opinion which the Confrontation Clause demands Kennedy be permitted to cross-examine, which he in fact did. We reject Kennedy's argument that the Confrontation Clause affords him the right to compel attendance of otherwise non-testifying witnesses upon which to "test" the original opinions of Dr.

---

13. Kennedy also vigorously contends that Dr. Sabet offered an opinion, in violation of the Confrontation Clause, that Viars was more likely killed by a man than a woman. We find no evidence whatsoever of any such opinion in the transcript of Dr. Sabet's testimony; counsel has failed to cite to that portion of the record containing such testimony.

Sabet. Although we determined that admission of the autopsy report was error due to the absence of Dr. Livingston, that does not necessarily require the State to produce Dr. Livingston and present him for cross-examination regarding Dr. Sabet's opinions. Rather, it compels a determination by the State as to whether it will call the authoring pathologist as a witness or proceed without the evidence presented in the autopsy report. As to the issue of whether the injuries were consistent with being struck with a rock, Dr. Sabet was the witness against Kennedy and therefore the only one of whom the Sixth Amendment guarantees confrontation.

To that end, we find it unnecessary at present to disturb our previous holding in *Jackson;* we find *Williams* a tenuous and highly distinguishable opinion which does not, with majority support, dispense with the issue of to what extent a surrogate expert may "rely" upon testimonial hearsay. However, it is clear that to the extent that such qualified physician is a "mere conduit" for the opinions of the authoring pathologist, such testimony violates the Confrontation Clause as outlined in *Bullcoming.* Moreover, to the extent that such "opinion about physical and medical cause of injury or death" as described in *Jackson* utilizes an autopsy report as its basis, courts should conduct a careful analysis under *Doe* before permitting disclosure of the content of the autopsy report in absence of its testifying author. As well-stated by the Fourth Circuit, "[t]he question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination." *U.S. v. Johnson,* 587 F.3d 625, 635 (2009).

Therefore, we find that the trial court's determination that Dr. Sabet's testimony, to the extent he merely reiterated the contents of the autopsy report, did not violate the Confrontation Clause was erroneous. However, we find that admission of Dr. Sabet's

independently formulated opinions as set forth hereinabove, which Kennedy had the right to cross-examine, did not violate the Confrontation Clause.

### C.

Having determined that error occurred in Kennedy's trial, this Court next turns to the issue of retroactivity as pertains to our adoption of *Crawford* in *Mechling.* With respect to retroactivity, the United States Supreme Court has unequivocally held that *Crawford* was a "new rule" and therefore was not retroactive. *Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). The Court stated that a new rule is defined as " 'a rule that ... was not "*dictated* by precedent existing at the time the defendant's conviction became final." ' " *Id.* at 416, 127 S.Ct. 1173 (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)). Utilizing that definition, the Court held that

> it is clear that *Crawford* announced a new rule. The *Crawford* rule was not "dictated" by prior precedent. Quite the opposite is true: The *Crawford* rule is flatly inconsistent with the prior governing precedent, *Roberts,* which *Crawford* overruled. "The explicit overruling of an earlier holding no doubt creates a new rule."

*Id.* (citations omitted). Having determined *Crawford* to be a new rule, the Court utilized the retroactivity analysis set forth in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) to support its holding that *Crawford* should not be applied retroactively:

> Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review. A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a " 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."

*Id.* (citations omitted). The Court then determined that *Crawford* was a procedural, not substantive, rule and that it further failed to reach the level of a "watershed rule of

criminal procedure" because it was neither necessary to prevent "an impermissibly large risk of an inaccurate conviction" nor did it " 'alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding.' " *Id.* at 418, 420, 127 S.Ct. 1173 (quoting *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990)).[14]

Nevertheless, the Supreme Court held in 2008 that the States were not constrained in their ability to give *broader* retroactive effect to new rules of criminal procedure and could therefore fashion their own law with respect to the retroactivity of *Crawford. Danforth v. Minnesota,* 552 U.S. 264, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008). In *Danforth,* the Court explained that the *Teague* retroactivity analysis "speaks only to the context of federal habeas" and reinforced the principle that "States are independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on federal constitutional guarantees." *Id.* at 281, 280, 128 S.Ct. 1029. Significantly, the Court underscored the fact that

> our jurisprudence concerning the "retroactivity" of "new rules" of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the availability or nonavailability of remedies. The former is a "pure question of federal law, our resolution of which should be applied uniformly

throughout the Nation, while the latter is a mixed question of state and federal law." *Id.* at 290–91, 128 S.Ct. 1029 (citations omitted).

It appears that no other state or federal court has held *Crawford* to be retroactive, with the limited exception of New Mexico, which granted retroactive effect of *Crawford* to the defendant in that case alone. *State v. Forbes,* 138 N.M. 264, 119 P.3d 144 (2005), *cert. denied, New Mexico v. Forbes,* 549 U.S. 1274, 127 S.Ct. 1482, 167 L.Ed.2d 244 (2007). West Virginia has not directly addressed the retroactivity of *Crawford/Mechling.*[15]

In light of *Danforth,* this Court is charged with making its own determination as to whether the holdings in *Crawford/Mechling* should be applied retroactively under West Virginia law. This Court has held that

> The criteria to be used in deciding the retroactivity of new constitutional rules of criminal procedure are: (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. Thus, a judicial decision in a criminal case is to be given prospective application only if: (a) It established a new principle of law; (b) its retroactive application would retard its operation; and (c)

---

**14.** With respect to whether a new rule is necessary to avoid an impermissibly large risk of an inaccurate conviction, the Court cited to the Ninth Circuit's application of *Schriro v. Summerlin,* 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), noting that " 'the question is whether testimony admissible under *Roberts* is so much more unreliable than that admissible under *Crawford* that the *Crawford* rule is "one without which the likelihood of an accurate conviction is *seriously* diminished." ' " *Whorton,* 549 U.S. at 420, 127 S.Ct. 1173 (quoting *Bockting v. Bayer,* 399 F.3d 1010, as amended, 408 F.3d 1127 (2005)). As to its determination that *Crawford* did not alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding, the Court stated that "in order to meet this requirement, a new rule must itself constitute a *previously unrecognized bedrock procedural* element that is essential to the fairness of a proceeding." *Id.* at 421, 127 S.Ct. 1173 (emphasis added).

**15.** However, in 2007, the Court perhaps foreshadowed the rule stated herein by implicitly suggesting that *Mechling* would be found to be non-retroactive. In a footnote in a *per curiam* decision in 2007 dealing with Confrontation Clause issues brought pursuant to a writ of habeas corpus, the Court stated "*Mechling* is not applicable to this case as the underlying criminal trial herein was conducted prior to the *Crawford* and *Mechling* decisions." *State ex. rel. Humphries v. McBride,* 220 W.Va. 362, 373 n. 11, 647 S.E.2d 798, 809 n. 11 (2007). The Court then proceeded to find a violation of the Sixth Amendment under the pre-*Crawford/Mechling* caselaw. Justice Starcher, in his concurring opinion, expressly recognized that the retroactivity of *Mechling* had not been addressed, but cautioned readers that the Court found that the appellant was deprived of his constitutional rights even under the "outdated, overruled analytical scheme." *Id.* at 375, 647 S.E.2d at 811.

its retroactive application would produce inequitable results.

Syl. Pt. 5, *State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996). Inasmuch as the United States Supreme Court has declared *Crawford* to be a "new rule," our holding in *Mechling* must be given like treatment. As such, we must proceed to employ the *Blake* retroactivity analysis to determine if this "new rule" should be given prospective only or retroactive application.[16]

We turn then to analysis of the *Blake* factors to determine retroactivity. First, the purpose of the new rule is clear: to ensure that criminal defendants are afforded their Constitutional right of cross-examination as against testimonial evidence. However, *Crawford*'s purpose cannot be construed to suggest that the results of criminal trials which permitted testimony now implicated by *Crawford* were inherently unfair or rendered unreliable results. The United States Supreme Court acknowledged that "the overall effect of *Crawford* with regard to the accuracy of factfinding in criminal cases is not easy to assess." *Whorton*, 549 U.S. at 419, 127 S.Ct. 1173. Moreover, the Court noted, critically, that "*Crawford* overruled *Roberts* because *Roberts* was inconsistent with the original understanding of the meaning of the Confrontation Clause, not because the Court reached the conclusion that the overall effect of the *Crawford* rule would be to improve the accuracy of factfinding in criminal trials." *Id.* at 419, 127 S.Ct. 1173. Therefore, although *Crawford* reflects a sharper recognition of the rights afforded to criminal defendants with regard to testimonial hearsay, it

does not stand for the proposition that the "'fundamental fairness and accuracy'" of criminal proceedings which occurred prior to it is inherently suspect. *Id.* at 414, 127 S.Ct. 1173 (quoting *Saffle, supra,* at 495, 110 S.Ct. 1257). As such, its "purpose" alone does not compel retroactive application.

Secondly, the extent of the reliance by law enforcement authorities on old standards is readily apparent. *Crawford* was decided in 2004; our decision in *Mechling* was issued in 2006. *Roberts* had been the prevailing case on introduction of hearsay evidence in a criminal proceeding as pertains to the Confrontation Clause since 1980. More pointedly, the Supreme Court's application of *Crawford* to forensic hearsay in *Melendez–Diaz* occurred in 2009, at which time Justice Kennedy contended in his dissent that the majority "disregards a century of jurisprudence" and is "contrary to authority extending over at least 90 years, 35 States, and six Federal Courts of Appeals." *Melendez–Diaz*, 557 U.S. at 330, 349, 129 S.Ct. 2527 (Kennedy, J., dissenting). Without question, based upon pre-*Crawford* caselaw, and more specifically pre-*Melendez–Diaz* caselaw, and particularly in light of W. Va.Code § 61–12–13 mandating the admission of autopsy reports into evidence, law enforcement, prosecutors, and courts have relied upon their ability to introduce autopsy reports and use surrogate experts at trial without offending the Confrontation Clause for many years. This factor militates strongly against retroactive application.

**16.** We are further guided by Syllabus Point 5 of *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), which this Court has often cited in conjunction with the then-prevailing standards for analysis of criminal law retroactivity:

> In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater then need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

Finally, the effect on the administration of justice by a retroactive application would be devastating. The effect of a retroactive application of *Crawford* was well-articulated by the Supreme Court of Florida when analyzing the issue under a similar analytical scheme as ours:

Retroactive application could require courts to "overturn convictions" and "delve into stale records to" determine whether defendants had a chance to cross-examine unavailable witnesses. When new trials were determined necessary to correct errors under *Crawford,* the justice system would then have to deal with a multitude of problems, including lost evidence and unavailable witnesses.[17] Such retroactive application would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit."

*Chandler v. Crosby,* 916 So.2d 728, 730–31 (Fla.2005) (footnote added) (citations omitted). We agree that the retroactive application of *Crawford* would be an unfathomable burden on the state with only a minuscule and theoretical enhancement of the accuracy of any of the countless verdicts it would overturn.

As such, *Blake* requires that *Crawford/Mechling* be given prospective application only inasmuch as it is a new principle of law, retroactive application of which would retard its operation and produce inequitable results, as illustrated above. As this Court stated in *State v. LaRock,* 196 W.Va. 294, 315, 470 S.E.2d 613, 634 (1996): "It is unfair to burden society with new trials or hearings where they were conducted fairly according to law, and subsequently were made questionable by an opinion of this Court, but the perceived errors have not been shown to affect the integrity of the proceedings."

■ In light of the foregoing, we hold that *State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006) stated a new rule of criminal procedure that is non-retroactive and is to be given prospective application only. This holding is not only called for by virtue of the *Blake* retroactivity analysis, but is also mindful of the exigencies of modern criminal practice. As we explained in *Blake,*

To invalidate, in hindsight, proceedings which were clearly consistent with our precedent at the time of their occurrence would be unfair to the prevailing party and the presiding judge who bear accountability for their actions. Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require a trial judge to anticipate all our decisions. The pressures of adjudication and the vagaries of criminal trial would make such an expectation unrealistic.

*Blake,* 197 W.Va. at 712, 478 S.E.2d at 562.

### D.

■ Finally, this Court must resolve the issues presented by Kennedy's choice of procedural mechanism and determine whether the foregoing errors afford him any relief. Kennedy contends that his case is on "direct" appeal, providing him with a new trial in the event that error is found. As indicated above, despite the fact that the issues raised by Kennedy fall squarely within the type of matter properly made subject of a writ of habeas corpus pursuant to W. Va.Code § 53–4A–1,[18] Kennedy moved for a new trial pursuant to Rule 33 of the West Virginia Rules

---

**17.** Indeed even in the case *sub judice,* the State represented that the Circuit Clerk was unable to locate the original exhibits utilized at Kennedy's trial.

**18.** W. Va.Code § 53–4A–1(a) (Repl.Vol.2008) provides, in part:

Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the constitution of this State, or both ... may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief, if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence[.]

of Criminal Procedure. However, the State urges this Court to disregard Kennedy's choice of procedure and treat this appeal as a habeas corpus proceeding, making our review collateral rather than direct. The State argues simply that Kennedy's case was not "in litigation or on appeal" such as to benefit from a new trial should this Court find error.[19] We agree.

There simply can be no question that Kennedy's conviction was not "in litigation or on appeal" and was, therefore, final at the time that either *Crawford* or *Mechling* announced the "new rule" in 2004 and 2006, respectively.[20] Kennedy's availability of direct appeal to this Court was exhausted in 1999 with the filing of the appeal which culminated in our decision in *Kennedy I.* Simply filing a motion for a new trial in lieu of a writ of habeas corpus does not permit a defendant to do an "end-run" around the rules of finality. Finality is determined under substantive legal

principles—not by procedural trickery. Regardless of how many motions for a new trial are filed by a criminal defendant, it yields him but one direct review. All other review is collateral.

Therefore, as a collateral attack on his conviction, our recognition that *Crawford* and *Mechling* state a "new rule" of criminal procedure and our holding that it should be held non-retroactive dictates the measure of relief afforded to Kennedy.[21] This Court has previously applied and endorsed the principle that a "new constitutional rule[ ] of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *State ex rel. Azeez v. Mangum,* 195 W.Va. 163, 170 n. 17, 465 S.E.2d 163, 170 n. 17 (1995) (quoting *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). Therefore, these "new rules" of criminal procedure afford him no relief.[22]

**19.** The Court notes the apparent mutual disregard of Rule 33's time limitations by the parties and the trial court. Rule 33 provides:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on any other grounds [other than newly discovered evidence] shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

Notably, this time limitation is not subject to discretionary extension by the court: "[T]he court may not extend the time for taking any action under Rules 29, 33, 34 and 35, except to the extent and under the conditions stated in them." W.V.R.Crim. P. 45(b)(2). However, there is no evidence in the record before us that the State objected to Kennedy's untimely motion below. Moreover, the trial court did not address the issue in its memorandum order. The Court cautions the State about the apparent forfeiture of its right to challenge Kennedy's appeal on procedural grounds. The United States Supreme Court has held that Rule 33's federal counterpart is a "claim-processing rule" and not "jurisdictional." *Eberhart v. U.S.,* 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005). As such, the Court held that a defense of untimeliness could be forfeited or waived. *Id.* at 19, 126 S.Ct. 403.

**20.** This Court has held that "[a] case is final if it is not 'currently in litigation or on appeal where the error has been properly preserved at trial.' " *State ex rel. Azeez v. Mangum,* 195 W.Va. 163, 170, 465 S.E.2d 163, 170 (1995) (quoting *State v. Kopa,* 173 W.Va. 43, 53, 311 S.E.2d 412, 422

(1983) and Syl. Pt. 2). Moreover, we have elaborated that

> [a] conviction and sentence becomes final for purposes of retroactivity analysis when the availability of direct appeal to this Court is exhausted or the time period for such expires. Concededly, the general rule in this country is to apply new law retroactively to cases that were pending on direct appeal at the time the new rule was adopted. Thus, appellate courts are obliged to apply the law as they find it at the time of the judgment.

*Blake,* 197 W.Va. at 711–12, 478 S.E.2d at 561–62; *see also State v. Reed,* 218 W.Va. 586, 589, 625 S.E.2d 348, 351 (2005).

**21.** As the United States Supreme Court stated in *Danforth, supra,* "[w]hat we are actually determining when we assess the 'retroactivity' of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought." *Danforth,* 552 U.S. at 271, 128 S.Ct. 1029. The Court aptly noted, "[i]t may, therefore, make more sense to peak in terms of the 'redressability' of violations of new rules, rather than the 'retroactivity' of such rules." *Id.* at 271 n. 5, 128 S.Ct. 1029.

**22.** Likewise, Kennedy has no redress for Confrontation Clause violations arising out of our application of *Bullcoming, Melendez–Diaz,* or *Williams*—all applying *Crawford*—with respect to Dr. Sabet's testimony. *See State v. Guthrie,* 205 W.Va. 326, 343 n. 25, 518 S.E.2d 83, 100 n. 25 (1999) (noting the distinction between a new rule and a decision which "simply clarifies an exist-

■ Moreover, inasmuch as we have determined *Mechling* to be non-retroactive, it is likewise unavailable as the basis of a collateral attack in an extraordinary habeas corpus proceeding to any other petitioner. *See Bradley*, 163 W.Va. at 348–49, 256 S.E.2d at 888 (recognizing that only *"full retroactivity* in a constitutional criminal case provides an opportunity for collateral attack by habeas corpus upon all criminal judgments, not merely those judgments for which direct appeal is still available"(emphasis added)). Our post-conviction habeas corpus statute clearly states that any person who contends that his conviction or sentence was rendered void due to denial or infringement of his constitutional rights may file a writ of habeas corpus "if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated[.]" W. Va.Code § 53–4A–1(a). To the extent there has been a final adjudication, the statute affords relief in instances where new, binding, procedural or substantive standards are imposed only insofar as they are to be applied retroactively:

> For the purposes of this article, and notwithstanding any other provisions of this article, no such contention or contentions and grounds shall be deemed to have been previously and finally adjudicated or to have been waived where, subsequent to any decision upon the merits thereof or subsequent to any proceeding or proceedings in which said question otherwise may have been waived, any court whose decisions are binding upon the Supreme Court of Appeals of this State or any court whose decisions are binding upon the lower courts of this State holds that the Constitution of the United States or the Constitution of West Virginia, or both, impose upon state criminal proceedings a procedural or substantive standard not theretofore recognized, *if and only if such standard is intended to be applied retroactively and would thereby affect the validity of the petitioner's conviction or sentence.*

W. Va.Code § 53–4A–1(d) (emphasis added). Inasmuch as we have determined *Mechling* to be non-retroactive, it is unavailable as a basis for habeas corpus relief to any petitioner.

Accordingly, regardless of the procedural means by which this case presents itself for analysis of the developing jurisprudence and important issues raised herein, the errors found by virtue of applying the new rule of *Crawford/Mechling* are not redressable by the petitioner herein, Kennedy, and therefore do not afford him a new trial.[23]

### IV. CONCLUSION

For the foregoing reasons, we affirm the September 23, 2010, order of the Circuit Court of McDowell County, West Virginia.

Affirmed.

---

ing principle of federal law"). *Bullcoming, Melendez–Diaz*, and *Williams* merely clarify and apply *Crawford*'s principles and do not, themselves, constitute "new" rules of criminal procedure. Moreover, our decision to afford no relief to petitioner Kennedy is not without precedent in West Virginia, even in absence of the above analysis. *See LaRock, supra*,(establishing that the equities may permit denial of relief even to the party raising the issue before the Court in the first instance); *accord Blake*, 197 W.Va. at 712–13, 478 S.E.2d at 562–63.

23. Because of the unmistakable rules of finality, which dictate the measure of relief afforded to Kennedy, we find it unnecessary to address the issue of whether the errors identified herein were harmless.