BAKER, Chief Judge
(concurring in part and in the result):
I write separately because I continue to believe that the application of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and the line of cases that followed, cannot and should not be resolved without analysis of the distinct features and purposes of the military drug testing program. A lab report generated as part of an anonymous unit random urinalysis inspection intended to deter drug use and promote military readiness is not the same as a lab report generated from the testing of a single sample by a forensic drug lab for the purpose of prosecution. As importantly, I do not believe one can resolve this case without first addressing Williams v. Illinois, — U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). Williams is the Supreme Court’s latest Crawford case. It was decided after United States v. Sweeney, 70 M.J. 296 (C.A.A.F. 2011), and United States v. Blazier, 69 M.J. 218 (C.A.A.F.2010), and it narrows the reach *64 of the Supreme Court’s prior cases upon which this Court relies.
The Confrontation Clause provides that “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him -” U.S. Const, amend. VI. At root, the Confrontation Clause bars prosecution on the basis of testimony that is not subject to “the crucible of cross-examination.” Crawford, 541 U.S. at 61, 124 S.Ct. 1354. The Supreme Court has sought to define what “witness against him” means with respect to out-of-court testimony. Id. at 51-52, 124 S.Ct. 1354.
What the Confrontation Clause means after Crawford in the context of lab reports has proven particularly vexing to the Supreme Court. See Williams, 132 S.Ct. at 2227 (DNA matching report); Bullcoming v. New Mexico, -U.S.-, 131 S.Ct. 2705, 2709, 180 L.Ed.2d 610 (2011) (blood alcohol analysis); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 320, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (cocaine testing). As a result, it is not clear what these cases mean or should mean with respect to materials generated as part of the Department of Defense’s ongoing random urinalysis program.[1] That answer depends on how, and whether, one gets to a majority of five on the Supreme Court. It also depends on which Supreme Court case one cites, and then, which text is applied. There is persuasive authority to support almost any position. This elevates the importance of subordinate courts explaining, in context, how and why a particular outcome is reached.
I.
Williams is the latest Supreme Court case to address the meaning of “testimonial” evidence. Like prior Court cases, it does not address the military context. Neither does it address a generalized program of urinalysis inspection that has multiple purposes other than criminal prosecution. Indeed, the military program in this case addresses, in order of priority, three purposes: (1) military readiness and fitness; (2) deterrence; and (3) the separation of servieemembers who use drugs.[2] A court-martial is one possible outcome of a positive test, but it is not listed as a purpose of the program. In this case, the basis of the test as listed on the form the lab technicians filled-in or reviewed was “random inspection of individuals within a unit,” not for example “probable cause,” another option.[3]
*65 In the ease of the military, for example, the majority of positive tests result in administrative or nonjudieial response, not criminal prosecution.[4] Like any scientific testing system, the urinalysis program is designed to identify and safeguard against false positives. This is a critical function tied directly to good order and discipline and unit morale. Where entire units are randomly inspected for drug use, the quality and redundancy of the safeguards to avoid mistakes are thus critical not only to the scientific process, but to military readiness. It follows that the more accountable a random urinalysis process is, the greater the confidence service personnel will have in the outcomes generated by the random inspections in which they are required to participate.
The Supreme Court’s ease law has not addressed the distinctions in lab process and testing that the military’s random drug screening program presents. See Sweeney, 70 M.J. at 309-13 (Baker, J., joined by Stucky, J., concurring in part and dissenting in part). This Court has not sought to fill in these contextual differences and blanks. To the contrary, each of the Supreme Court’s lab cases is addressed to a single specific lab test, involving a specific identified crime, where criminal prosecution is the purpose of the report. See Williams, 132 S.Ct. at 2227 (DNA match report in rape prosecution); Bullcoming, 131 S.Ct. at 2709 (blood alcohol analysis in DWI prosecution); Melendez-Diaz, 557 U.S. at 320, 129 S.Ct. 2527 (cocaine testing in drug distribution prosecution). As Justice Sotomayor noted in her controlling[5] concurrence in Bullcoming, the Supreme Court’s eases dealt with statements which had “ ‘a primary purpose of creating an out-of-court substitute for trial testimony,’ ” 131 S.Ct. at 2720 (quoting Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011)), and not lab testing situations in which the state “suggested an alternate purpose, much less an alternate primary purpose, for the” lab report, id. at 2722.
Williams is the latest Supreme Court opinion to address the meaning of the Confrontation Clause after Crawford. As a result, it warrants more than passing citation in the majority opinion, especially since it expressly delimits the Supreme Court’s prior cases on which this Court relies. See Williams, 132 S.Ct. at 2242-43. It is the most important of the Supreme Court’s post-Crawford cases, because it appears to go *66 furthest in attempting to wrestle with the ambiguities that remain after Crawford. It was also decided after Sweeney and Blazier.
The conflicting opinions in Williams support a variety of standards for “testimonial” evidence. As illustration, one can extract the following statements from Williams :
The abuses that the Court has identified as prompting adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing the targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions.
132 S.Ct. at 2242. Williams later notes an alternate standard regarding primary purpose that does not consider the formality of the statement. See id. at 2243 (“[I]f a statement is not made for ‘the primary purpose of creating an out-of-court substitute for trial testimony,’ its admissibility ‘is the concern of state and federal rules of evidence, not the Confrontation Clause.’ ”). In his concurrence, Justice Breyer emphasized the distinct nature of professional scientific analysis:
[T]he employees who contributed to the report’s findings were professional analysts working on technical matters at a certified laboratory; and the employees operated behind a veil of ignorance that likely prevented them from knowing the identity of the defendant in this case. Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades .... [S]uch statements also presumptively fall outside the category of “testimonial” statements that the Confrontation Clause makes inadmissible.
Id. at 2249 (Breyer, J., concurring). Justice Thomas, concurring in the judgment, argued that formality, not purpose, was the touchstone of the Confrontation Clause:
[T]he Confrontation Clause regulates only the use of statements bearing “indicia of solemnity.” This test comports with history because solemnity marked the practices that the Confrontation Clause was designed to eliminate, namely the ex parte examination of witnesses under the English bail and committal statutes during the reign of Queen Mary_ [T]he Confrontation Clause reaches “formalized testimonial materials,” such as depositions, affidavits, and prior testimony, or statements resulting from “formalized dialogue,” such as custodial interrogation.
Id. at 2259-60 (Thomas, J. concurring in the judgment) (internal citations omitted). Justice Kagan’s dissent suggested a broader “available for use at a later trial” standard for “testimonial” evidence:
[T]he [Confrontation] Clause’s “core class of testimonial statements” ... [include statements] “made under circumstances which would lead an objective witness reasonably to believe that [they] would be available for use at a later trial.” ...
... “[T]he accused’s right is to be confronted with” the actual analyst ....
... [T]he report was made to establish “ ‘some fact’ in a criminal proceeding.”
Id. at 2266 (Kagan, J., with whom Scalia, J., Ginsburg, J., and Sotomayor, J., joined, dissenting) (third bracket in original). However, the Williams dissent also favorably cited a primary purpose test, though it was distinct from the primary purpose test of the plurality. See id. at 2273 (“We have previously asked whether a statement was made for the primary purpose of establishing ‘past events potentially relevant to later criminal prosecution’ — in other words, for the purpose of providing evidence.”) (quoting Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).
From these statements three different tests emerge for determining whether lab material is testimonial: (1) a “primary purpose” test, which considers the historical reasons for adoption of the Confrontation Clause including the use of out-of-court statements (often extracted under duress) to convict persons in court (often of treason) without the opportunity to question the witness or test the veracity of the statements, and which asks whether the primary purpose for generating the out-of-court statement or data was for criminal prosecution; (2) a stylistic test, *67 which looks to the form and solemnity of the out-of-court statement, rather than its purpose, to determine if it is “testimonial”; and, (3) a literal test, which considers any statement brought into a trial, including some but apparently not all lab notations, to be subject to cross-examination if the maker of the statement could reasonably have contemplated the possibility of prosecution.
A majority of courts interpreting Crawford after Williams have adopted a purpose-based test, reflecting analysis of both the historical purposes behind the Confrontation Clause as well as the primary purpose for the particular lab report (statement) at issue. See, e.g., United States v. Cameron, 699 F.3d 621, 640 (1st Cir.2012) (“To rank as ‘testimonial,’ a statement must have a ‘primary purpose’ of ‘establishing or proving past events potentially relevant to later criminal prosecution.’” (quoting Bullcoming, 131 S.Ct. at 2714 n. 6)); United States v. Polidore, 690 F.3d 705, 711-12, 716-18 (5th Cir.2012) (“Although it does appear that the declarant contemplated that his call could lead to a later criminal prosecution, he was not making his statements to establish or prove past events potentially relevant to later criminal prosecution.”) (internal quotation marks omitted); Brown v. Epps, 686 F.3d 281, 287 (5th Cir.2012) (“[A] statement is not testimonial if it is procured under ... circumstances where the primary purpose is not to create an out-of-court substitute for trial testimony.”); United States v. Sedillo, No. 11-2237, 2013 U.S.App. LEXIS 2167, *41-*42, 2013 WL 363469, at *14 (10th Cir. Jan. 31, 2013) (Brisco, C.J., dissenting) (distinguishing Williams from case in which “[t]he primary purpose of the DNA test was to accuse a targeted individual and to create evidence for use at trial,” and in which the lab analyst knew that if the results were inculpatory, they would be used against this particular defendant at trial). Several courts have adopted a joint solemnity-primary purpose test. See, e.g., People v. Lopez, 55 Cal.4th 569, 581-82, 147 Cal.Rptr.3d 559, 286 P.3d 469 (Cal.2012) (to be testimonial, a statement “must have been made with some degree of formality or solemnity,” and its “primary purpose [must] pertai[n] in some fashion to a criminal prosecution”); People v. Dungo, 55 Cal.4th 608, 620 n. 5, 147 Cal.Rptr.3d 527, 286 P.3d 442 (Cal.2012) (“But formality is not enough to make an extrajudicial statement testimonial; the statement must also have a primary purpose pertaining to the investigation and prosecution of a crime.”); see also Dungo, 55 Cal.4th at 628-30, 147 Cal.Rptr.3d 527, 286 P.3d 442 (Chin, J., concurring) (asserting that, after Williams, a statement is only testimonial if it meets both the solemnity and primary purpose tests); People v. Leach, 366 Ill.Dec. 477, 980 N.E.2d 570 (2012) (“[W]e conclude that under the objective test set out by the plurality in Williams, under the test adopted in Davis, and under Justice Thomas’s ‘formality and solemnity’ rule, autopsy reports prepared by a medical examiner’s office in the normal course of its duties are nontestimonial.”). Other courts have adopted a literal test, as endorsed by the majority opinion in this case.[6] See, e.g., United States v. Pablo, *68 696 F.3d 1280, 1287, 1289 (10th Cir.2012) (“A testimonial statement is a statement that a reasonable person in the position of the de-clarant would objectively foresee might be used in the investigation or prosecution of a crime .... [G]iven the facts of this case and the plain-error posture of our review, we need not decide the precise mandates and limits of Williams, to the extent they exist.”).
No court has addressed a context like that in the military, where multiple tests are conducted at once on numerous anonymous samples for the purpose of military readiness and deterrence and where the procedures are intended to safeguard against false positives in a demonstrable and accountable way in part to support military morale. To the contrary, all of these post-Williams cases involve singular tests for specific criminal law investigations, whether to identify a specific culprit for prosecution (as in Williams), or to prove that a particular suspect is guilty, cf. Melendez-Diaz, 557 U.S. at 319-20, 129 S.Ct. 2527 (proving that the white powdery substance possessed by suspected drug dealer was cocaine); Bullcoming, 131 S.Ct. at 2709-11 (proving that the blood alcohol content in the suspected drunk driver was above legal limits). Which line of reasoning one selects from Williams is outcome determinative in different directions. It is easy to see, for example, how the application of the “solemnity” test might cover a statement with the word “certify” in it. It is also easy to see how a primary purpose test would lead to an opposite result in a lab report documenting in an objective manner all the results from a random unit sweep. Less certain is how the “would be available for use at a later trial” or literal standard would apply especially where Williams appears to dramatically narrow this earlier language from Crawford.[7]
I do not fault the majority for adopting a rule. Blazier I, 68 M.J. 439, adopts a clear rule with respect to a cover document that is specifically produced for prosecuting a particular person in a criminal proceeding. Id. at 443-43 (cover memorandum, which was produced “for court-martial use” after accused’s samples “tested positive for illegal substances” and which detailed the drug tests and summarized the results, was “clearly testimonial”); see also Blazier II, 69 M.J. at 224 (cross-examination of “laboratory certifying official” familiar with lab procedures but who did not take part in testing did not satisfy the right to confront the authors of the cover memorandum). The rule has to be set somewhere, and there is value in establishing a rule and sticking with it.
My trouble is with the treatment of the DD-2624 Specimen Custody Form, and by implication all the other standard chain-of-custody documents, after Williams. One can see how each of the legal statements taken from Williams might result in the exclusion or inclusion of each line of the DD-2624. The majority does not explain how or why Williams applies, or more to the point, why it doesn’t apply. Nor does the majority explain how we have gotten from Lord Cobham and the dungeons below the Tower of London, see Crawford, 541 U.S. at 44, 124 S.Ct. 1354, to the recording of lab results at the Brooks Army Medical Lab in determining what is testimonial or determining what it *69 means to bear witness against someone in the context of unit inspections.
There is an argument, for example, that none of the material on the form DD-2624 is testimonial, because it is not composed of the sort of out-of-court statements against which the Confrontation Clause was intended to protect and the primary purpose of the statements is directed toward military readiness and not criminal prosecution. There is a separate and equally valid argument that Block H is testimonial because the word “certification” is used in validating the results and process. Thus, this block satisfies the solemnity requirement of Justice Thomas. See Williams, 132 S.Ct. at 2259-60 (Thomas, J., concurring in the judgment) (fifth vote concurrence). But that does not explain the inclusion of Block G, which merely records a lab result in a dispassionate objective manner. Moreover, if Block G is testimonial, which it would appear to be based on Sweeney, see 70 M.J. at 301 (“[A] statement is testimonial if ‘made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” (quoting Blazier I, 68 M.J. at 442)), but not Williams, then it is not clear why all the results and data compiled by the lab technicians at Brooks, or for that matter all the chain-of-custody signatures, are not also testimonial. As Justice Breyer notes in Williams, “[o]nee one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the other laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so.” 132 S.Ct. at 2246 (Breyer, J., concurring). The line of demarcation for Block H is clear to the extent it is based on the word “certify.” But it is not clear why some neutral and objective entries are testimonial and others are not.
The application of the Confrontation Clause to lab data and custody reports generated pursuant to the military’s random urinalysis program seems random. The person who certifies that lab procedures were followed is providing out-of-court testimony, but the persons who sign the “quality control review” sheet and the “final laboratory certifying official review” sheet[8] are not doing so. The person who indicates that the sample being tested belongs to Appellant[9] is not “testifying,” but the person who indicates that the data recorded represents THC is testifying, and all in a context where prosecution is only one possible outcome of a positive test and, by percentage, the least likely. Cf. Melendez-Diaz, 557 U.S. at 335-36, 129 S.Ct. 2527 (Kennedy, J., with whom Roberts, C.J., Breyer, J., and Alito, J., joined, dissenting) (noting the inconsistent applications of the testimonial standard).
II.
In the end, it may not make a difference which parts of which Defense Department urinalysis lab report are testimonial. In light of the first holding in Williams regarding the admission of expert testimony and this Court’s unanimous view in this case, that so long as an expert lab supervisor testifies and draws his or her own independent conclusion from the lab reports, any Confrontation Clause error is presumptively harmless beyond a reasonable doubt. Cf. Bullcoming, 131 S.Ct. at 2722 (Sotomayor, J., concurring in part) (“[T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue .... It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results.”).
But it should matter. We should get the law right, which every judge on this Court is assuredly trying to do. It also seems peculiar, if not cynical, for the military to *70 prosecute urinalysis eases based on evidence this Court has now determined is constitutionally inadmissible, but nonetheless harmless beyond a reasonable doubt. That cannot contribute to confidence in the urinalysis program or the military justice system generally.
We should also consider the effect of our decisions on military readiness and morale. Is it clear what needs to change in the random urinalysis process in order to conduct the program in a manner consistent with this Court’s application of Crawfordl Is it possible to build in redundant and accountable checks on the process of random urinalysis inspections so as to assure servicemembers they will not be falsely identified for using drugs, without also necessitating the production of multiple Crawford witnesses at trial? Or will this continue to be litigated and resolved on a case-by-case, line-by-line basis? These questions are as important as they are rhetorical.
Unless we are constitutionally compelled to conclude that a person who validates the chain of custody, objectively records lab data, or validates the process used for a random urinalysis sweep is a witness for the purposes of the Confrontation Clause, I would not adopt such a literal rule. Such a rule is not needed to protect the confrontation rights of the accused, who under any Crawford theory or test remains free to call witnesses that are needed and constitutionally necessary to put on a defense. Such a rule could discourage accountability, which increases the likelihood of false positives and mistakes. See Williams, 132 S.Ct. at 2251 (Breyer, J., concurring). Such a rule would incentivize limiting the number of lab statements and lab technicians so as to avoid the “solemnity” of a document and would result in a process with fewer accountable cheeks and certifications. Alternatively, prosecutors might decline to introduce lab data at all, and rely exclusively on expert testimony. This might have the detrimental effect of eliminating the presence of empirical, testable scientific reports altogether, and turning a urinalysis trial into an opaque presentation of a scientist instructing the members to accept that the accused is guilty. See Williams, 132 S.Ct. at 2267-77 (Kagan, J., with whom Sca-lia, J., Ginsburg, J., and Sotomayor, joined, dissenting) (looking to formality alone “grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause’s protections”); Crawford, 541 U.S. at 52, n. 3, 124 S.Ct. 1354 (“We find it implausible that a provision which con-cededly condemned trial by sworn ex parte affidavit thought trial by unsworn ex parte affidavit perfectly OK”). Moreover, in the unique military context, presentation of the complete urinalysis process allows members to validate a program which they themselves are subject to. Alternatively, courts-martial will be left to continue litigating each entry and each block of each form going forward leading to inconsistent rulings. The majority’s rule will also certainly lead to inconsistent application of the law. Different commanders will differently weigh the needs of military readiness against the leadership, administrative, nonjudicial, and prosecutorial choices that they will face after a positive urinalysis test. From my perspective, Supreme Court case law does not address this military context, and neither the text of the Constitution nor ease law dictates this result.
For these reasons, I concur in the result and in the analysis regarding the introduction of Ms. Kaminski’s expert testimony, but do not join the analysis with respect to the DoD Form DD-2624 or note 6, which in my view, should address the distinct military context presented by a random urinalysis inspection as well as Williams, the Supreme Court’s latest Crawford ease.

. See Dep't of Defense Dir. 1010.01, Military Personnel Drug Abuse Testing Program (MPDATP) (Sept. 13, 2012) [hereinafter Dep't of Defense Dir. 1010.01]; Dep’t of Defense Dir. 1010.16, Technical Procedures for the Military Personnel Drug Abuse Testing Program (MPDATP) (Oct. 10, 2012); see also Sweeney, 70 M.J. 296; United States v. Blazier (Blazier II), 69 M.J. 218 (C.A.A.F.2010); United States v. Blazier {Blazier I), 68 M.J. 439 (C.A.A.F.2010); United States v. Harcrow, 66 M.J. 154 (C.A.A.F.2008); United States v. Magyari, 63 M.J. 123 (C.A.A.F.2006).

. The MPDATP operates under Dep't of Defense Dir. 1010.01. Dep’t of Defense Dir. 1010.01 mandates three purposes for drug testing: (1) to ''[p]ermit commanders to use drug testing to detect drug abuse and to assess the security, military fitness, readiness, and good order and discipline of their commands”; (2) to deter ser-vicemembers, including those entering active duty, from misusing drugs “including pharmaceutical medications, illegal drugs, and other substances of abuse"; and (3) to “[pjrocess all Service members who knowingly misuse drugs for separation in accordance with applicable Service regulations.” Id. at para. 4.b.-d. The directive notes that the “drug testing program shall enable commanders to take action, adverse or otherwise (including referral for treatment), as appropriate.” Id. at para. 4.d. Specifically, the military requires drug testing of service applicants, new military entrants, reservists, appointees to service academies, Reserve Officer Training Corps cadets, and midshipmen. Id. at end. 2, para. 1.

.The primary purpose for testing a sample is written on the DD-2624 next to the Social Security Number of the person who gave the sample. The DD-2624 is labeled with a code stating the basis of the test: random inspection of an entire unit (IU), random inspection of individuals within a unit (IR), probable cause (PO), a consent search (VO), rehabilitation (RO), a safety mishap (AO), a command-directed examination (CO), medical (MO), new entrant (NO), or other (OO). Dep’t of Defense Dir. 1010.01 at end. 2, para. g. While the directive notes that "[u]rinalysis results may be used as evidence in disciplinary actions under the UCMJ, and in administrative actions (including separation from the Military Service),” id. at end. 2, para. h.(l), the primary purpose for random inspection, rehabilitation, *65 safety mishap, command direction, medical, or new entrant testing is clearly not criminal prosecution. While the primary purpose of a "probable cause” or "consent" search may be less clear, those are not present in this case. Indeed, Appellant's DD-2624 explicitly states next to his Social Security Number that the "Test Basis” is "IR,” that is, “random inspection or examination of an individual(s) within a unit.” See id. at encl. 2, para. g.(b).

. Most positive drug tests do not result in prosecution. In the fiscal year 2011, 8,988 active duty personnel tested positive for controlled substances. Office of the Under Secretary of Defense for Personnel and Readiness, Status of Drug Use in the Department of Defense Personnel: Fiscal Year 2011 Drug Testing Statistical Report at 8. In the same year, there were 4,898 courts-martial (including general, special, and summary courts-martial) across the four services and for all offenses. Annual Report Pursuant to the Uniform Code of Military Justice for the Period of October 1, 2010 to September 30, 2011, sec. 3, app. at 21, sec. 4, app. at 24, sec. 5, app., sec. 6, app. A (2012), reprinted in 70 M.J. CXI, CXXVIII, CLVIII, CLXVI (2012). While at least the Navy collects quarterly reports on drug prosecutions, see Dep’t of the Navy, Naval Service Training Command Inst. 5800.1A, encl. (1): Quarterly Criminal Activity Feeder Report of Disciplinary Infractions and Courts-Martial (May 16, 2012), these reports apparently are not publicly available. However, even without the precise statistics, it is clear that even if drug prosecutions were the sole crime charged in courts-martial in fiscal year 2011, then only about half of the personnel who tested positive were charged. Obviously, since drug crimes make up only a small percentage of courts-martial charges, the actual percentage of positive drug tests that are used in criminal prosecution is much lower. See also Sweeney, 70 M.J. at 309-11 (Baker, C.J., joined by Stucky, J., concurring in part and dissenting in part).

. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....'” (alteration in original) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))).

. Other courts have favorably cited the "available for use at a later trial” test, but have understood it in the context of a "primary purpose” test. See, e.g., People v. Nunley, 491 Mich. 686, 821 N.W.2d 642, 655 n. 77 (2012) (While asserting that its "analysis is consistent with the reasoning of both the lead opinion and the dissenting opinion” in Williams, the Michigan Supreme Court found that “the primary purpose of the certificate of mailing was not to accuse a targeted individual of engaging in criminal conduct” and that "the circumstances here would not lead an objective witness to reasonably believe that the certificate of mailing would be available for use at a later trial” because no crime had yet been committed or investigation started.); State v. Kennedy, 229 W.Va. 756, 735 S.E.2d 905, 915 (2012) (alteration in original) ("The primaiy purpose test states that a statement is testimonial if the primaiy purpose ... is to establish or prove past events potentially relevant to later criminal prosecution. Since that time, the United States Supreme Court has reiterated that the primaiy purpose test focuses the inquiry on whether the evidence was for the purpose of establishing or proving some fact at trial. Consistent with these decisions, this Court has adopted the following iteration of the primary purpose test to determine if a statement is testimonial: ... [A] testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.”) (citations and internal quotation marks omitted).

. Williams considerably narrows the Supreme Court’s previous language, previously adopted by this Court, that "a statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” Sweeney, 70 M.J. at 301 (quoting Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354). In this context, it may be worth noting that Crawford did not explicitly adopt the "available for use at a later trial,” standard, but rather merely articulated it as one possible formulation among many, and specifically noted that this was the formulation suggested by the brief for the National Association of Criminal Defense Lawyers. See Blazier I, 68 M.J. at 442. Similarly, Melendez-Diaz noted the "available for use at a later trial” standard as one of several possible formulations, 557 U.S. at 310, 129 S.Ct. 2527 (quoting Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354), but noted that the affidavits in Melendez-Diaz "not only” would meet the "available for use at a later trial” standard, but in fact had the "sole purpose " of providing evidence at trial. Id. at 311, 129 S.Ct. 2527. Thus it appears that the Supreme Court never adopted the "available for use at a later trial” language as the definitive standard for evidence implicating the Confrontation Clause, regardless of what the Williams dissent suggests, see 132 S.Ct. at 2266 (Kagan, J., with whom Scalia, J., Ginsburg, J., and Sotomayor, J., joined, dissenting).

. Technicians sign quality review sheets, give signatures indicating that the batch was dumped, and make notations regarding the pouring of samples and the GC-MS autotune (calibration).

. The lab technician who attaches bar code stickers to the GC-MS injector worksheet, so that the GC-MS knows what sample is associated with what number, apparently does not sign.